# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3613

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Shirley Wallace, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: March 11, 2003

Filed: March 31, 2003

_____

Before HANSEN, Chief Judge, RILEY and MELLOY, Circuit Judges.

_____

RILEY, Circuit Judge.

Shirley Wallace (Wallace) filed a motion to suppress inculpatory statements made during a police interrogation conducted at her place of employment. The district court granted her motion to suppress. The government appeals, and we reverse.

## I.    BACKGROUND

On March 24, 1999, at approximately 9:00 a.m., federal agents executed a search warrant on Patient Transfer Service, Inc. (PTS), a private company which

provides ambulance services. PTS was under investigation for submitting fraudulent Medicare and Medicaid claims. Wallace was PTS's office manager.

During the execution of the search warrant, nine federal agents were dressed in business suits and carried their weapons concealed. After entering the two-story office building, the agents, in loud and authoritative voices, directed the employees to move away from their desks. At that time, Wallace was in the business office she shared with four other employees. Wallace initially moved away from her desk, but then asked if the employees could save their computer work, which the agents said they could do. The agents instructed the employees to report to the front office area.

The agents secured the site to prevent destruction of evidence and to account for all of the people in the building. The employees were told not to leave until they were interviewed or talked to someone. Seventeen employees were found in the building and interviewed. Although the search lasted from 9:00 a.m. until approximately 2:30 p.m., employees were allowed to use the restrooms without permission, leave for lunch, go outdoors to smoke, complete ambulance services, and return to their duties after their interviews. Agents did not monitor or block the doors to the front office. Wallace and other employees were able to move freely between the front office and the business office. Two employees left for lunch on their own, with PTS pagers in case the agents needed them. These two employees went shopping and then picked up their lunch, at which time they were paged back to the offices.

Special Agent Sharon Dawkins (Agent Dawkins), an eleven-year veteran of the FBI, initiated Wallace's interview by telling Wallace to come into the employee lounge. Agent Dawkins had boxes and paperwork set up in the employee lounge, because she was also the evidence custodian. Agent Dawkins interviewed only two employees that day. Other agents interviewed other employees in the main office area and other rooms. Agent Dawkins and Wallace were alone in the lounge during the

interview, which lasted ten to fifteen minutes. The lounge contained a couch, chairs, a television and bathrooms. Wallace told Agent Dawkins she was upset by the initial entry of the other agents. After Agent Dawkins explained the reasons for such an entry, Wallace seemed fine and was calm.

Agent Dawkins used a preprinted questionnaire and asked Wallace general questions about her job duties and about PTS billing practices. Wallace explained she was familiar with Medicare billing, and Medicare required a patient to be bed-confined to qualify for ambulance service. Wallace answered in a cordial and cooperative manner. After the interview, Agent Dawkins told Wallace she could leave. Wallace went back to the main office, then to her office where she sat in her chair watching the search and assisting agents by opening her drawers. Wallace ate the lunch she brought from home in the ambulance bay area. Wallace testified "there was no thought you could leave," but she said she would have stayed, in any event, because she was the office manager.

Wallace was not advised of her <u>Miranda</u> rights, was not told she was free to leave, and was not told she did not have to participate in the interviews.[1] The agents did not know Wallace's title at PTS or who the PTS office manager was before the questioning. Wallace answered the same general employment and billing questionnaire as did the other employees. Wallace was not a suspect.

We should note the search and questioning occurred on the one-year anniversary of a public school shooting, to which a PTS ambulance had responded.

---

[1]Agent Dawkins testified the agents normally tell the employees in these business searches that they are free to leave after they are congregated; however, she did not know if the lead agent made that statement on this occasion.

Memorials commemorating the earlier shooting were scheduled, and the PTS employees were emotionally charged before the search began.[2]

Wallace moved to suppress her statements made during the interview. Wallace claimed she had been the subject of a custodial interrogation without benefit of <u>Miranda</u> warnings. After a suppression hearing, the district court granted the motion to suppress, concluding the balance of the six indicia outlined in <u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir. 1990), weighed in favor of suppression. Before trial of Wallace and her co-defendants, the government appealed the suppression order. We have jurisdiction pursuant to 18 U.S.C. § 3731, which provides for an appeal of an order granting a motion to suppress before trial.

## II. DISCUSSION

The initial rounding up and temporary detention of employees are justified under the Fourth Amendment when executing a search warrant founded on probable cause. <u>See</u> <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981) (holding "a warrant to search . . . founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted"). "[T]he intrusiveness of detaining an occupant of the premises being searched [is] outweighed by the law enforcement interests in: (1) preventing flight; (2) minimizing the risk of harm to the officers; and (3) conducting an orderly search." <u>United States v. Reinholz</u>, 245 F.3d 765, 778 (8th Cir. 2001) (citing <u>Summers</u>, 452 U.S. at 701-03). Wallace does not dispute that the initial detention was justified, but argues the number of agents and manner and tone of the detention created a custodial atmosphere to her questioning.

___

[2]The district court said, "I think it was significant that this was the anniversary of these Westside shootings, so Ms. Wallace and others were emotionally affected by that. They were predisposed to be vulnerable." However, this predisposition about an unrelated matter is not relevant to our inquiry.

-4-

As a procedural safeguard, an individual must be warned about the rights encompassed in the privilege against self-incrimination before "an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda v. Arizona, 384 U.S. 436, 479 (1966). In determining whether Wallace was "in custody," "we uphold findings of historical fact unless clearly erroneous, but we apply the controlling legal standard to the historical facts utilizing an independent review." United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002) (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)).

In Miranda, the Court noted "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." Miranda, 384 U.S. at 477-78. "In deciding whether a person was 'in custody,' we must examine both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation 'in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody.'" Axsom, 289 F.3d at 500 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). We have developed a non-exhaustive list of six common indicia used to determine whether an individual is in custody:

> (1)  whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
> (2)  whether the suspect possessed unrestrained freedom of movement during questioning;

(3)    whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4)    whether strong arm tactics or deceptive stratagems were employed during questioning;

(5)    whether the atmosphere of the questioning was police dominated; or,

(6)    whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349.

The court conducts a balancing of the six indicia. Axsom, 289 F.3d at 501. "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." Id. at 500-01.

For Wallace, four of the factors are clear, while two require further discussion. Wallace was not informed the questioning was voluntary, she was free to leave, or she was not considered under arrest. Additionally, Agent Dawkins, not Wallace, initiated the questioning; however, the agent did not use strong arm tactics or deceptive stratagems. The district court found "no criticism of Agent Dawkins's conduct in the way she conducted the interview. . . . I did not find that she was overly aggressive or intimidating." Wallace was not placed under arrest at the end of the questioning; in fact, she was not arrested or indicted until over one year later.

The district court determined Wallace was restrained in her movement because the agents corralled the employees at the onset of the search. See discussion above. However, employees freely used the restrooms, went outside to smoke, completed ambulance services off the premises, went to lunch, including shopping, and, after

their interviews, returned to their full work duties. Our main focus must be on the individual's restraint *during the interview*. See Axsom, 289 F.3d at 501 ("Axsom was not permitted to move at will during the interview" as agents escorted him to the bathroom and retrieved a drink for him). It is difficult to say whether Wallace could have roamed freely about the employee lounge because the interview lasted only ten to fifteen minutes. Wallace was not physically restrained either immediately before or after the interview.

In determining whether Wallace was restrained, the district court found it significant the search occurred on the one-year anniversary of certain unrelated school shootings. The district court found "Ms. Wallace and others were emotionally affected by that. They were predisposed to be vulnerable." Therefore, the district court asked, "Was it objectively reasonable for someone else in Ms. Wallace's state of mind to feel [restrained]?"[3] The psychological tension on Wallace caused by the earlier, unrelated shootings does not change her non-custodial questioning into a custodial encounter. We still evaluate the situation from the perspective of a reasonable person. An objective, reasonable person test is necessary to avoid (1) being dependent upon self-serving declarations of agents and of the defendant, and (2) placing the burden upon the agents to anticipate the frailties and idiosyncracies of every person whom they question. Berkemer, 468 U.S. 442 & n.35.

Similar to the second indicium, the fifth indicium is whether the *questioning*, not the execution of the search warrant, was police dominated. See Axsom, 289 F.3d at 502 (two agents conducted questioning while seven agents searched the small house). Here, only one agent interviewed Wallace in an employee lounge. The entire

_____

[3]Additionally, in evaluating a co-defendant's motion to suppress, the district court found, "There was police domination to a point, but it did not seem to affect [co-defendant] to the same extent it did Ms. Wallace." The district court refused to suppress the statements of two other parties, the owner and the business manager, who were also at the premises that day.

event occurred at Wallace's workplace, a location familiar to Wallace and a place where she would be comfortable and less threatened. The only police domination occurred earlier when the agents suddenly entered Wallace's office and instructed the employees to move away from their desks and move into the main office area.

This questioning of Wallace, who was not a target of the investigation, by a single agent, in an employee lounge, for ten to fifteen minutes, from a pre-printed list of questions, without any physical restraint, strong arm tactics, or deceptive strategies, and without being placed under arrest, did not constitute a custodial interrogation. Under the relevant circumstances here, a reasonable person would not have felt her situation was one of custody.

## III.   CONCLUSION

Because Wallace was not in custody during her interview, Miranda warnings were not required. We conclude the district court erred in suppressing Wallace's statements. Therefore, we reverse and remand for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.