# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1179

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Alois Larry Wolk, Jr., also known as | * | Eastern District of Missouri. |
| Larry Wolk, | * | |
| | * | |
| Appellant. | * | |
| | * | |

_____

Submitted: November 7, 2002

Filed: July 30, 2003

_____

Before RILEY, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Alois Larry Wolk, Jr. was convicted of one count of transporting child pornography (violating 18 U.S.C. § 2252A(a)(1)) and three counts of possessing child pornography (violating 18 U.S.C. § 2252A(a)(5)(B)). Wolk's primary argument on appeal is that the Supreme Court decision in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) requires the dismissal of his indictment. Wolk also challenges the

district court's[1] denial of his suppression motion, his *Batson* challenge, and his objection to the district court's sentencing enhancement under Section 2G2.2(b)(3) of the Sentencing Guidelines. We find no error and affirm his sentence.

## I.

As part of an undercover investigation, Detective Sergeant Michael Zaglifa posed as a thirteen-year-old girl with the screen name "AshleyS_13" in an Internet Relay Chat room entitled "preteen 101." Eventually, AshleyS_13 received a request for a private Internet chat from Wolk, who was using the screen name of ^fish^. Wolk then sent AshleyS_13 obscene, graphic photos of children engaging in sex, incest, and bondage. During the conversation, Wolk identified himself as a sixty-year-old man named Simon.

Based upon the chat room exchange and upon information obtained from Wolk's Internet service provider, the Federal Bureau of Investigation (FBI) obtained a search warrant for Wolk's residence. On November 16, 2000, at approximately 9:30 a.m., seven state agents and federal officers executed the search warrant. The officers knocked at the door; Wolk's wife answered and advised them that Wolk was at a training seminar. After attempting to contact Wolk, two of the state officers traveled to Wolk's nearby office and informed him that a search warrant was being executed at his residence. At that time, the officers advised Wolk that although he did not have to return to his residence, his wife wished for him to be there.

Wolk then drove himself home, and the officers followed him. However, at one point the cars were separated, and as a result Wolk arrived before the officers at approximately 10:10 a.m. Upon arrival, he encountered FBI Special Agent Gerald Bell, who informed him that the officers had a search warrant for his residence,

---

[1] The Hon. Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

acquired in the course of a child pornography investigation. Wolk then sat down in the living room with Bell and two other officers. Wolk's wife remained in the kitchen with another officer.

Bell told Wolk that "if he wanted to talk[, ]it was of his own free will and that he was free to go at any time[. H]e was not under arrest." Wolk replied that he was willing to talk with them. He admitted to the officers that he had installed a file server[2] on his computer, but insisted that he only used it to trade music files.

One officer then told Wolk that the authorities knew there was child pornography in the house. Wolk then admitted that he had child pornography on his computer, that he had been collecting it for two years, and that he had sent child pornography from the file server in his house. Wolk indicated that he archived his file server onto three CD ROMs. The officers then seized the CDs and his computer. On them, officers found numerous pornographic images, a portion of which contained child pornography.

Wolk then voluntarily signed a statement. In the statement, he admitted he (1) used the screen name ^fish^, (2) identified himself as a sixty- to sixty-two-year-old male named Simon, and (3) traded nude internet pictures of adults, teens, and some child pornography. The authorities completed the residential search at approximately 11:30 a.m.

---

[2] A file server is "[a] program, running on a computer, that allows different programs, running on other computers, to access the files of that computer." National Communications Systems, Technology & Standards Division, *Telecommunications: Glossary of Telecommunication Terms* (1996), *available at* http://www.its.bldrdoc.gov/fs-1037/.

Wolk was then indicted and later convicted of one count of transporting child pornography and three counts of possessing child pornography. His appeal alleges four errors.

## II.

First, Wolk argues that the Supreme Court decision in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) requires the dismissal of his indictment. We disagree. *Ashcroft*, which declared portions of the Child Pornography Prevention Act of 1996 unconstitutional and overbroad, does not provide the relief Wolk seeks.

## A.

In 1996 Congress passed the Child Pornography Prevention Act of 1996 ("the Act"). Prior to the passage of the Act, the definition of "child pornography" applied to visual depictions of actual minors "engaging in sexually explicit conduct." 18 U.S.C. § 2252 (1994 ed.); *Ashcroft*, 535 U.S. at 241. After its passage, however, the Act expanded the definition of "child pornography" to criminalize virtual pornography. This included "any visual depiction, including a computer-generated image, that 'is, or appears to be, of a minor engaging in sexually explicit conduct,' and [also included] any sexually explicit image that was 'advertised, promoted, presented, described, or distributed in such a manner that convey[ed] the impression' of depicting 'a minor engaging in sexually explicit conduct.'" *United States v. Deaton*, 328 F.3d 454, 455 (8th Cir. 2003) (per curium) (citing *Ashcroft*, 535 U.S. at 239).

However, in *Ashcroft*, the Supreme Court declared these definitions–found in 18 U.S.C. § 2256(8)(B) and 18 U.S.C. § 2256(8)(D) respectively–unconstitutional and overbroad under the First Amendment. *Ashcroft*, 535 U.S. at 258. In declaring these provisions unconstitutional, the Court relied upon two of its prior First Amendment decisions: *Miller v. California*, 413 U.S. 15 (1973) and *New York v. Ferber*, 458 U.S. 747 (1982). The Court noted that generally under *Miller*, pornography can be banned only if it is obscene. *Ashcroft*, 535 U.S. at 246.

Nevertheless, it observed that under *Ferber* pornographic images depicting actual children can be proscribed regardless of their obscenity. *Id.* at 249. The Court observed that *Ferber* permits such regulation because production of child pornography is "intrinsically related" to child sexual abuse. Child pornography is "a permanent record of a child's abuse [and] the continued circulation itself would harm the child." *Id.* However, the Court noted that the Act's ban on virtual child pornography in Section 2256(8)(B) "prohibits speech that records no crime and creates no victims by its production" and "covers materials beyond the categories recognized in *Ferber* and *Miller*." *Id.* at 250, 256. As a result, it declared Section 2256(8)(B) overbroad. *Id.* at 256. Likewise, the court concluded that Section 2256(8)(D) was overbroad. *Id.* at 258. After considering the Government's reasons for such regulation, the Court held that their justifications were insufficient, and thus these sections were unconstitutional under the First Amendment. *Id.* at 256, 258.

The Government charged Wolk with transporting and possessing child pornography. 18 U.S.C. §§ 2252A(a)(1), 2252A(a)(5)(B). *Ashcroft* did not declare either of these statutes unconstitutional. *E.g.*, *United States v. Kelly*, 314 F.3d 908, 909 (7th Cir. 2003) ("[*Aschroft* struck] down only the statute's expanded definition of child pornography to encompass virtual material.") However, the Government's indictment defined "child pornography" to include virtual pornography and contained

the precise language that *Ashcroft* later declared unconstitutional.[3] Wolk thus argues that his indictment is constitutionally infirm and should be dismissed.

B.

Before considering Wolk's claim, however, we must first identify our standard of review. The Government urges that plain error is the appropriate standard because Wolk failed to preserve this objection below. We agree.

In order to preserve an issue for appeal, a defendant must timely object and clearly state grounds for his objection so that the trial court has an opportunity to prevent or correct error. *United States v. Williams*, 994 F.2d 1287, 1294 (8th Cir. 1993). Wolk filed a timely motion to dismiss, but whether he "clearly stated the grounds for his objection" is at issue. In one section of his motion, Wolk stated:

---

[3] The indictment defines "child pornography" to mean:

any visual depiction, including any photographic film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where–

(A) the production of such visual depiction involves the use of a minor engaged in sexually explicit conduct;
(B) such visual depiction is, *or appears to be,* of a minor engaging in sexually explicit conduct;
(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or
(D) such visual depiction is *advertised, promoted, presented, described or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct.*

Appellant's App. at 30–31 (emphasis added).

-6-

(1) Because Defendant's constitutional rights (a) against self-incrimination, (b) to equal protection, (c) his civil rights to be free from oppressive acts of the police and (d) to due process of law under the Missouri and United States Constitution have been violated, the Defendant respectfully requests that all charges brought against him by the State be dismissed by this Court.

Appellant's App. at 71. On its face this section does not "clearly state grounds for objection." Instead the section is vague, conclusory, and confusing. Not only does it not reference the indictment, it does not address anything even remotely relating to the issue of virtual pornography–either the First Amendment or the statutes, 18 U.S.C. §§ 2252A(a)(1), 2252A(a)(5)(B).

However, when we read with it other sections of the motion, his objection becomes clearer–Wolk's motion related to his argument that the police obtained evidence in violation of *Miranda.* Paragraph three of the motion states that "[i]f the Court grants the Defendant's motion to suppress all evidence gathered after the failure to give *Miranda* warnings to the Defendant, there would be insufficient evidence to support the above referenced charges and therefore, such charges would be subject to dismissal due to lack of evidence." *Id.* Further, the statements of Wolk's counsel at the motion hearing confirm this conclusion. Wolk's counsel stated that "the motion to dismiss . . . only bears relevance after the Court makes a determination on the suppression hearing. I don't think that it's ripe until after the Court determines whether the statements are admissible by Mr. Wolk." Mot. Hearing Trans. at 2–3 (Aug. 2, 2001).

No mention was made of virtual pornography or of any First Amendment claims. Thus, by negative inference, Wolk has stated both orally and in writing that the motion does not relate to any of the issues presented in *Ashcroft.* Wolk even conceded this expressly. At the beginning of the hearing, the district court asked Wolk's counsel whether his motion was attacking the facial validity of the statute.

Wolk's counsel replied that ". . . his rights were being violated–not by being charged–but by the involuntary statement that was taken . . . ." *Id.* at 3. As a result, the district court summarized his understanding of the motion: "So really, it all goes to the evidence that's to be offered in the suppression hearing," *id.*, to which Wolk's counsel replied, "That's correct, your Honor." *Id.*

Therefore, not only did Wolk not preserve the virtual pornography argument, he never made it. As a result, we review Wolk's constitutional challenge for plain error.

## C.

In order to establish plain error, Wolk must show that "(1) the district court committed an error, i.e., deviated from a legal rule, (2) the error was plain, i.e., clear under current law, and (3) the error affected [Wolk's] substantial rights." *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001). If there is indeed error that is plain, then Wolk bears the burden of proving that it "affec[ted his] substantial rights." *United States v. Olano*, 507 U.S. 725, 734 (1993) (citations omitted). "In most cases, [this means that he must] show[ ] that the error was prejudicial." *Id.* If Wolk can overcome these obstacles, he still must overcome one more hurdle. Because our authority to correct plain error is discretionary, we will "not exercise [our] discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732 (citations omitted).

The government concedes the first two factors–that the indictment was erroneous (because it included a definition that was unconstitutional) and that the error was plain (because of *Ashcroft*). It submits, however, that the error did not affect Wolk's substantial rights and, alternatively, that affirming Wolk's convictions would not "seriously affect the fairness, integrity or public reputation of judicial proceedings." We agree that Wolk has not carried his burden.

We come to this conclusion "because (1) the evidence established that the children depicted in the pictures introduced at trial were actual children[, ] (2) no one ever claimed, or even hinted, that the images were of virtual children," and (3) Wolk stipulated that these were actual children. *United States v. Hall*, 312 F.3d 1250, 1260 (11th Cir. 2002).

First, the evidence establishes that the children in the pictures at issue were real. The photos introduced for Count I (Transportation of Child Pornography) were described by the undercover agent in human terms–"boys with erections"; "brother and a sister enjoying each other"; "girls engaging in sex acts." Trans. of Voir Dire & Tr. at 160, 170, 180 (Sept. 17, 2001). Likewise, FBI Special Agent Jerry Bell testified that the photos introduced for Counts II, III, and IV (Possession of Child Pornography) were images of child pornography, which he defined as "children under [eighteen] engaged in sex acts or sexually explicit activity." Tr. Trans. at 61–62 (Sept. 18, 2001).

Moreover, these pictures are in the record. We have examined them. Upon review, we conclude the children depicted in these images were real. *See United States v. Richardson*, 304 F.3d 1061, 1064 (11th Cir. 2002) (performing a plain error analysis and concluding the same); *see also Hall*, 312 F.3d at 1260 (same); *United States v. Pearl*, 324 F.3d 1210, 1219 & n.4 (10th Cir. 2003) (Briscoe, J., dissenting) (same).

Second, there was no testimony or evidence presented at trial that the pictures were virtual images. While not evidence in the case, the opening statements of both counsel are illustrative. In the Government's opening statement, the Assistant United States Attorney stated, "Let me be clear here. I am not talking about art. I'm talking about children engaged in sex acts. That's what this child pornography is." Trans. of Voir Dire & Tr. at 96–97 (Sept. 17, 2001). Wolk's counsel stated likewise, "Now what I also want to make clear is we're not disputing that the pictures that they're

going to show you are child pornography. Evidence is going to show that [the pictures are] child pornography. We're not standing here defending those disgusting pictures." *Id.* at 101–02. Wolk's counsel also stipulated to the court the same. Tr. of Testimony of Alois Larry Wolk Direct Examination Vol. 3 at 21–2 (Sept. 19, 2001). These comments are consistent with Wolk's defense–that he did not knowingly possess or transport the child pornography images.

Finally, Wolk admitted numerous times that the images were child pornography and that there were actual minors in the pictures. He first admitted this during his initial questioning when he told Bell that he had child pornography on his computer. Another officer then advised Wolk that "child pornography involved children engaged in sexual activity, photos of children engaged in sexual activity." Wolk agreed that he had photographs which met the described definition. Tr. of Testimony of Alois Larry Wolk Direct Examination Vol. 1 at 39–40 (Sept. 19, 2001).

Later at trial Wolk testified that the images from the three computer CDs that were introduced into evidence were child pornography. Tr. of Testimony of Alois Larry Wolk Direct Examination Vol. 3 at 22 (Sept. 19, 2001). He also admitted that it is harmful to possess and trade child pornography because "it's harmful to our society, to the people doing it, to the *children*." *Id.* at 44. (emphasis added).

We thus conclude that although plain error exists in the indictment, Wolk was not prejudiced. His indictment did contain two portions of the definition of child pornography that were later found to be unconstitutional. However, this error did not prejudicially influence Wolk's trial because the pictures he transported and possessed were of real children.[4] As a result, Wolk's constitutional challenge fails.

---

[4] Thus, because Wolk failed to carry his burden that "the error affected [his] substantial rights," we need not discuss our discretionary analysis.

III.

Wolk also argues that the district court erred when it denied his motion to suppress. Wolk's motion contended the police obtained his confession in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) because they did not advise him of his Constitutional rights. *Miranda* dictates that "an individual must be warned about the rights encompassed in the privilege against self-incrimination before '[he or she] is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning.'" *United States v. Wallace*, 323 F.3d 1109, 1112 (8th Cir. 2003) (citing *Miranda*, 384 U.S. at 479).

The Government agreed that no *Miranda* warnings were given, but responds they were not necessary because Wolk was not "in custody." The district court concurred with the Government and denied Wolk's motion to suppress. In determining whether Wolk was "in custody," "we uphold [the district court's] findings of historical fact unless clearly erroneous, but we apply the controlling legal standard to the historical facts utilizing an independent review." *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (citation omitted).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Further, "we must examine both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." *Axsom*, 289 F.3d at 500 (citation omitted).

To do this, we have developed a list of six common, but non-exhaustive indicia to determine whether an individual is in custody:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Wallace*, 323 F.3d 1109, 1112 (8th Cir. 2003). In applying these indicia we employ a balancing test. *Axsom*, 289 F.3d at 501. "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *Id.* at 500–01.

Applying the six factors to this case, we conclude that Wolk was not in custody when he was questioned. First, Wolk knew that the questioning was voluntary and that he was free to leave. When Wolk was initially contacted, the officer told him that he did not have to go back to his home for the execution of the search warrant. Wolk chose to drive to his residence. At his residence, Wolk was informed that the interview was voluntary, that he was free to leave, and that he was not under arrest. *See United States v. Jones*, 630 F.2d 613, 616 (8th Cir. 1980) ("The absence of a formal arrest and the advice of freedom to decline to answer, while not conclusive, are indicative of noncustodial interrogation."). He also voluntarily signed the statement.

Moreover, there is no evidence that Wolk's freedom of movement was restrained. He drove himself to his home. At one point during the drive to Wolk's residence, his car and the officers' car even became separated. When he arrived at his

residence, he was told that he was free to leave. Further, at no point during the questioning did the officers threaten Wolk or use deceptive techniques.

We note that the police initiated contact with Wolk and that at one point three officers questioned him. However, these factors are not enough to convince us that Wolk was in custody for purposes of Miranda. The questioning took place at his own residence, *see United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985) (while house setting can be coercive, "such is not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."), and he was only questioned for an hour and twenty minutes–"certainly not a marathon session designed to overcome [defendant's] will." *Id.*

Thus, upon weighing these non-exhaustive indicia independently, we conclude that the district court did not err when it found that Wolk was not in custody.

IV.

Wolk argued below and argues on appeal that three black jurors were improperly struck from the jury based upon their race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court rejected his challenge. We review the district court's ruling of a *Batson* challenge for clear error. *United States v. Pherigo*, 327 F.3d 690, 695 (8th Cir. 2003). "Our inquiry is guided by the well-established three-prong analysis of *Batson*. First, the opponent of the peremptory challenge must establish a prima facie showing that the challenge is discriminatory." *Id.* (citation omitted). "The proponent of the peremptory challenge must then articulate a race-neutral explanation for the challenge. If a race-neutral explanation is offered, the challenger must show that the explanation is a pretext for discrimination." *Id.*

First, we examine Wolk's prima facie case. "This can be done by showing circumstances that give rise to a reasonable inference of racial discrimination."

*Simmons v. Luebbers*, 299 F.3d 929, 941 (8th Cir. 2002) (citations omitted). To establish his prima facie case, Wolk only adduced that three black jurors had been struck. He offered nothing further. The district court then ruled that Wolk had not met his prima facie case. We will defer to this determination.

Moreover, on appeal Wolk cites to no additional evidence of racial discrimination. This is not sufficient. The mere recitation of the fact that black jurors were struck from the jury cannot alone establish a prima facie case. *United States v. Matha*, 915 F.2d 1220, 1222 (8th Cir. 1990) ("This Court has held that the movant cannot carry the burden of establishing a prima facie case with numbers alone."); *United States v. Dawn*, 897 F.2d 1444, 1448 (8th Cir. 1990) ("[A] defendant who requests a prima facie finding of purposeful discrimination is obligated to develop a record, beyond numbers, in support of the asserted violation."); *see also United States v. Grandison*, 885 F.2d 143, 148 (4th Cir. 1989) (defendant failed to establish prima facie case where six of nine veniremen struck by Government were black). Thus, because Wolk has not established a prima facie case, his *Batson* challenge must fail.

V.

Finally, Wolk argues that the district court erred when it enhanced his offense level by four based upon § 2G2.2(b)(3) of the Sentencing Guidelines. We review the district court's interpretation and application of the Sentencing Guidelines to the facts de novo. *United States v. Parker*, 267 F.3d 839, 847 (8th Cir. 2001). Section 2G2.2(b)(3) allows for a four-level enhancement "[i]f the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence . . . ." On September 22, 2000, Wolk sent several images of child pornography to AshleyS_13. These images included: (1) a nude, minor Asian girl wearing a leather collar being held against the genitals of a nude, masked adult male holding a whip; (2) a nude, minor Asian girl wearing a leather collar being held with spread legs against the genitals of an adult male; (3) a nude, minor Asian girl with a collar and handcuffs that are chained to the collar being held against the nude adult male.

Wolk does not contest the content of these images. Instead, he argues that these imagines are neither sadistic, masochistic, nor depicting violence. He is mistaken. The pictures are both sadistic and violent. In *Parker* we held the term sadism to mean "the infliction of pain upon a love object as a means of obtaining sexual release" and "delight in physical or mental cruelty." 267 F.3d at 847. We defined violence as the "exerting of any physical force so as to injure or abuse." *Id.* These pictures reflect physical force and show abuse. They depict children who are being abused through the use of force (either through holding or by handcuffing). The pictures are also sadistic because they express a delight in mental and physical cruelty. *Id.* ("We determine that when a pornographic image depicts an adult male engaging in the sexual conduct of the nature we have here, the conduct portrayed is sufficiently painful, coercive, abusive, and degrading to qualify as sadistic or violent within the meaning of § 2G2.2(b)(3).").[5]

Wolk also argues that § 2G2.2(b)(3) contains an intent element and because there allegedly was no evidence that he intended to transport material containing sadistic or masochistic material, he should not be subject to the enhancement. *See United States v. Tucker*, 136 F.3d 763, 764 (11th Cir. 1998) (per curium) (holding that Section 2G2.2(b)(3) has an intent element); *United States v. Kimbrough*, 69 F.3d 723, 734 (5th Cir. 1995) (same). *But see United States v. Richardson*, 238 F.3d 837, 840 (7th Cir. 2001) (disagreeing with *Tucker* and *Kimbrough* and holding that Section 2G2.2(b)(3) has no intent element).

We agree with the Seventh Circuit. Section 2G2.2(b)(3) has no express intent element. Previously we have refused to read scienter elements into Guidelines when the Sentencing Commission has not provided them. *See, e.g., United States v. Gonzalez-Lopez*, __ F.3d __, __, *available at* 2003 WL 21637954, at *4 (8th Cir.

---

[5] Because the pictures are both sadistic and violent, "we need not consider whether the conduct depicted also was 'masochistic.'" *Parker*, 267 F.3d at 847.

2003)(concluding that the definition of crime of violence contained in § 2L1.2(b)(1) of the Guidelines does not contain a volitional element); *United States v. Amerson-Bey*, 898 F.2d 681, 683 (8th Cir. 1990) (holding that USSG § 2K2.1(b)(2) (related to possession of a stolen firearm) does not require that the defendant know the gun was stolen). This Guideline Section provides for a four-level enhancement "[i]f the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence . . . ." Because there is no express intent element in the Guidelines, we will not read one into it. *Richardson*, 238 F.3d at 840 (holding same).

Moreover, even if we were to read an intent element into § 2G2.2(b)(3), Wolk still would be subject to the enhancement because there was more than sufficient evidence introduced that he intended to transport material containing sadistic or masochistic conduct. A defendant's Internet conversations and possession of bondage material provide sufficient evidence of intent. *Tucker*, 136 F.3d at 764. Detective Sergeant Zaglifa testified that Wolk had shown AshleyS_13 how to access the "bondage" directory, how to access the "young" subdirectory, and how to receive images from his file server. Trans. of Voir Dire & Tr. at 119–22, 139-142 (Sept. 17, 2001). Wolk also asked the AshleyS_13 if she "like[d] the 107 and 108 pictures?", which were the bondage photographs. *Id.* at 157. Thus, the district court did not err in applying the enhancement pursuant to Guidelines § 2G2.2(b)(3).

## VI.

Accordingly, for the foregoing reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-16-