# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-3336

———————

United States of America,

        Appellant,

v.

Michael S. Czichray,

        Appellee.

\* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the District
of Minnesota.

———————

Submitted: March 8, 2004
Filed: August 11, 2004

———————

Before WOLLMAN, MORRIS SHEPPARD ARNOLD, and COLLOTON, Circuit
Judges.

———————

COLLOTON, Circuit Judge.

The government appeals from an order of the district court suppressing a written statement that Dr. Michael Czichray, a chiropractor, signed at the conclusion of an interview with FBI agents. The district court determined that the statement should be suppressed because it was the product of custodial interrogation that was conducted without informing Czichray of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). We respectfully disagree, and we reverse.

## I.

The district court, after receiving a report and recommendation from a magistrate judge, made extensive findings of fact concerning Czichray's encounter with the FBI, and the government does not assert on appeal that any of these findings were clearly erroneous. FBI agents Timothy Bisswurm and Sean Boylan went to Czichray's home the morning of February 16, 2001, to interview him regarding a health care fraud investigation. Prior to their arrival, the agents called Czichray at 4:30 a.m. to ensure that Czichray was home, stating they had the wrong number. At 6:30 a.m., the agents approached the home. When Czichray did not answer the door, Agent Boylan called Czichray by telephone and told him that he needed to come to the front door. When Czichray appeared, Boylan identified himself and Bisswurm as FBI agents and told Czichray they would like to speak with him for a few minutes. Boylan further informed Czichray that he need not speak with the agents. Although he was dressed in a t-shirt and boxer shorts, Czichray admitted the agents into his home, and the three men proceeded to the living room to discuss the investigation.

Over the course of the ensuing interview, which lasted nearly seven hours, Czichray was informed several times that his participation was voluntary, and that he was free to ask the agents to leave his home. About three hours into the interview, Czichray told the agents that he was late for work. The agents instructed Czichray to call in sick, and directed him not to inform his office about the investigation. Czichray complied. Although the telephone rang several times as the interview progressed, the agents instructed Czichray not to answer, and Czichray did not do so. When Czichray moved about his home on two occasions to go to the bathroom and his bedroom, Boylan accompanied him to check the rooms for telephones. During the interview, Czichray was told that if he did not cooperate, the agents would interview his 75-year-old father and others. The agents further told Czichray that they would "light up his world," and also suggested that if he did not cooperate, then

they could use the power of the FBI to pressure insurance companies to withhold payments from his business.

Czichray did not resist the agents' questioning during the interview, and he never asked them to leave. At the conclusion of the meeting, Czichray signed a written statement (after making one correction and initialing each page) acknowledging that "no one has threatened, coerced or promised me anything." The written statement contained admissions that Czichray had knowingly caused insurance companies to reimburse at least one hundred false claims, and knowingly paid illegal fees to persons who referred new patients to Czichray's chiropractic clinic. There was no threat of arrest during the encounter, and the agents never displayed weapons. Czichray was not arrested until weeks later.

Czichray was charged in a twenty-seven count indictment with various crimes relating to an alleged health care billing fraud scheme. He brought a motion to suppress his signed statement. After concluding that Czichray was in custody and had not been given *Miranda* warnings, the district court granted the motion. In reviewing the district court's grant of Czichray's motion to suppress, we review its conclusions of law *de novo*, and its findings of fact for clear error. *United States v. Guevara-Martinez*, 262 F.3d 751, 753 (8th Cir. 2001).

II.

The ultimate question in determining whether a person is in "custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation omitted). The "only relevant inquiry" in considering that question is how a reasonable person in Czichray's position would have understood his situation. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *see generally Yarborough v. Alvarado*, 124 S. Ct. 2140, 2147-50 (2004). In making that

evaluation, we consider the totality of the circumstances that confronted the defendant at the time of questioning. *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002).

We have observed that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (internal quotation omitted). The FBI agents who interviewed Czichray exercised this "obvious and effective" means of demonstration in spades. Boylan and Bisswurm testified that they informed Czichray at least eight times that his participation in the interview was voluntary, and that he was free to ask the agents to leave his home. The magistrate judge recommended that "[g]iven this evidence, which is not controverted," the district court should find that Czichray was advised of his freedom to terminate the interview at will. (Add. 114). The district court ultimately found that "[a]s the Magistrate Judge noted, it is clear from the record that the agents informed Czichray several times that he could refuse to speak with them, and that he could tell them to leave." (Add. 23).

We believe that this abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review, *United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir. 1982) (per curiam)), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.

-4-

The weighty inference that Czichray was not in custody after receiving such advice is strengthened further by the context in which the interview occurred -- the living room of Czichray's home. When a person is questioned "on his own turf," *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984), we have observed repeatedly that the surroundings are "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985); *see also United States v. Wolk*, 337 F.3d 997, 1007 (8th Cir. 2003); *Axsom*, 289 F.3d at 502; *United States v. Sutera*, 933 F.2d 641, 647 (8th Cir. 1991). Even our court's one brief suggestion to the contrary, *see Griffin*, 922 F.2d at 1355 n.15, also cited *Miranda* itself for the "accepted logic" that "an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody."

In the Supreme Court's only decision involving whether *Miranda* applied to questioning of a suspect in a private home absent formal arrest, the Court concluded that the suspect "hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding." *Beckwith v. United States*, 425 U.S. 341, 347 (1976). Elaborating on the "custodial surroundings" described in *Miranda*, the *Beckwith* Court explained that "the principal psychological factor" of concern was "*isolating the suspect in unfamiliar surroundings* 'for no purpose other than to subjugate the individual to the will of his examiner.'" 425 U.S. at 346 & n.7 (emphasis added) (quoting *Miranda*, 384 U.S. at 457). The teaching of *Beckwith*, which involved a three-hour interrogation by two IRS agents in the dining room of a residence, was that such "noncustodial interrogation" might possibly in some situations lead to an involuntary confession inadmissible under the Fifth Amendment, *id*. at 347-48, but that the prophylactic rule of *Miranda* was not applicable.

In reaching its conclusion that Czichray was nonetheless in custody, the district court relied on the presence of certain "coercive factors" identified in *United States v. Griffin*, 922 F.2d at 1349, which were said in *Griffin* to "aggravate the existence

of custody." *Id.* In *Griffin*, while emphasizing that our list of considerations was "merely intended to be representative of those indicia of custody most frequently cited by this and other courts when undergoing the prescribed totality of the circumstances analysis," *id.*, we identified six factors for consideration in making the custody determination: (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest; (2) "whether the suspect possessed unrestrained freedom of movement during questioning;" (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities; (4) "whether strong arm tactics or deceptive stratagems were employed during questioning;" (5) whether there was a police-dominated atmosphere; and (6) "whether the suspect was placed under arrest at the termination of the questioning." *Id.* We observed that the first three factors tended to mitigate the existence of custody, while the last three tended to aggravate it. *Id.* Both parties debate the presence and significance of these so-called "*Griffin* factors" in their briefs on appeal.

Although the "non-exhaustive" *Griffin* factors and their attendant balancing test are often cited in our decisions concerning *Miranda*, we recently resolved the question of "custody" as an *en banc* court with nary a mention of *Griffin*. *See United States v. LeBrun*, 363 F.3d 715, 719-24 (8th Cir. 2004) (en banc). There is no requirement, therefore, that the *Griffin* analysis be followed ritualistically in every *Miranda* case. When the factors are invoked, it is important to recall that they are not by any means exclusive, and that "custody" cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly. Exploring the nuances of such vague factors as "voluntary acquiescence," "strong arm tactics," and "police-dominated atmosphere" in order to place them on one side or the other of a balancing scale may tend to lose sight of the forest for the trees. The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest. And the court must consider whether the *historical facts*, as opposed to the one-step-removed *Griffin* factors,

establish custody. The debatable marginal presence of certain judicially-created factors that ostensibly tend to "aggravate the existence of custody" cannot create the functional equivalent of formal arrest where the most important circumstances show its absence.

The district court relied heavily on its finding that the FBI agents instructed Czichray not to alert others by telephone of the FBI's presence during the interview, and escorted Czichray to his bedroom and bathroom to check for telephones before Czichray entered the rooms. There are two difficulties with this emphasis on telephones. The first is precedent. In *United States v. Sutera*, officers conducted a three and one-half hour search of Sutera's apartment, and then interviewed him for one hour. They "prevented him from using his phone" during the search, and then questioned him "in isolation" in his apartment. 933 F.2d at 647. In response to Sutera's contention that prohibition on use of the telephone was one of several factors that demonstrated custody, we found the record "*devoid of any evidence* showing conduct by the officers which would lead to the conclusion that Sutera was in custody." *Id.* (emphasis added). Similarly, in *United States v. Helmel*, an FBI agent "answered all incoming telephone calls while the search and interview progressed," but we "fail[ed] to see how this created a coercive atmosphere." 769 F.2d at 1320.

The second difficulty presumably explains the precedent: That a suspect is discouraged from using a telephone in his home during an interview often is not probative of whether he is free to terminate the interview altogether. In this case, the FBI agents testified that they requested (or, as the district court found, "directed") Czichray not to use the telephone to disclose the presence of FBI agents, because such disclosure would interfere with Czichray's ability to cooperate with an ongoing investigation. If his cooperation with the FBI were known by alleged co-conspirators, then he could not assist the government (and potentially himself) through undercover telephone calls or recorded meetings with other suspects. This likely is a common request (or direction) from investigators who are soliciting cooperation. Like an

effort to preserve officer safety, *see Axsom*, 289 F.3d at 503, however, an effort to preserve opportunities to cooperate should not be understood by a reasonable person as a restriction on movement akin to formal arrest. Assuming a reasonable person in Czichray's position would feel that he was not free to use the telephone during the questioning, he still retained two viable options: conduct an uninterrupted interview with the agents or terminate the interview. *Sutera* and *Helmel* recognize that placing certain ground rules on an interview does not preclude a reasonable person from foregoing the interview altogether.

We also conclude that Czichray's lack of "voluntary acquiescence" in questioning does not tend to show that he was in custody. The district court thought the mere absence of resistance by Czichray, such as his "ma[king] no attempt to terminate the interview" and allowing the interview "to proceed to its closing," did not "rise to the level of active cooperation" that our court has found to constitute "voluntary acquiescence" as used in the third *Griffin* factor. (Add. at 33-34). Whatever the *Griffin* court meant by "acquiescence," *cf. Webster's Third New International Dictionary* 18 (2002) ("passive assent or submission"); 1 *Shorter Oxford English Dictionary* 20 (5th ed. 2002) ("Silent or passive assent to, or compliance with, measures or proposals"), we conclude that the initiation of questioning by FBI agents in this case is not significant evidence of restraint on Czichray's freedom of movement. Against a backdrop of repeated advice that he was free to terminate the interview, Czichray's decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest. *Cf. Alvarado*, 124 S. Ct. at 2144-46, 2149-50 (where police initiated two-hour interview of suspect in police station, *did not* tell suspect he was free to leave, and engaged in "pretty friendly conversation" during interview, state court was clearly "reasonable" in concluding that suspect was not in custody). This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators.

Czichray argues that "threats" made by the FBI agents should be counted as a factor weighing in favor of custody. We do not believe that informing a suspect that investigation of his alleged fraud will "light up his world" by exposing his activities to his friends, family, and neighbors is a threat that aggravates the existence of custody. *See United States v. Martin*, 369 F.3d 1046, 1052-53, 1057 (8th Cir. 2004). It is appropriate for an investigator to advise a suspect of the potential course and consequences of a criminal investigation. Suspects frequently confront difficult decisions about whether to defend against potential criminal charges or to pursue resolutions that may ameliorate certain unpleasant consequences. If the suspect's father happens to be a witness with relevant information in such an investigation,[1] then knowledge of potential investigative activities may influence the suspect's decision whether to short-circuit the investigation by cooperating. But the presentation of information that requires such a decision does not tend to restrain a person's freedom of movement such that he should be deemed in custody. As we said in *LeBrun*, "some degree of coercion is part and parcel of the interrogation process and [ ] the coercive aspects of a police interview are largely irrelevant to the custody

---

[1]Agent Boylan testified as follows at the suppression hearing:

> The only references that were made to [Czichray's] father is he at some point told us later that his father had left -- lent him some money regarding his MRI clinic, and the references were made in the sense of if we believe his father had information that's -- and that's evidence of a crime that's what we'd have to do. We'd have to go talk to that person whether it's his father, a relative, somebody he doesn't know, or whether it's a coemployee.

(Suppr. H'rg Tr., Vol. II at 58, Nov. 26, 2002). Agent Bisswurm testified that Czichray's father was later interviewed, because "[d]uring our interview with Dr. Czichray, he indicated his father loaned him $50,000 for his MRI business, and we went to ask him questions about that loan." (Suppr. H'rg Tr., Vol. III. at 128, Nov. 27, 2002).

determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart."  363 F.3d at 721.

The district court's finding that agents threatened to use the power of the FBI to prevent insurance companies from making legitimate payments to Czichray's business is not well explained, because the statements were denied by the agents, and Czichray did not elaborate.  Perhaps the point is that agents would notify insurance companies of Czichray's fraudulent practices in the course of their investigation, in which case the insurance companies would cease dealing with Czichray of their own accord.  If so, then the "interference" with business would be just another natural consequence of the doctor's fraudulent activities coming to light.  If the FBI agents misled Czichray by exaggerating their ability to control the conduct of private insurance companies (or if they really had the power to dictate non-payment of private insurance payments), then their statements might be one of many factors relating to the voluntariness of any admissions, but they would have little or no bearing on whether Czichray's freedom of movement was restrained for purposes of the *Miranda* custody analysis.  *Cf. Oregon v. Mathiason*, 429 U.S. 492, 495-96 (1977) ("Whatever relevance [the officer's false statement during questioning] may have to other issues in the case, it has nothing to do with whether respondent was in custody for purposes of the *Miranda* rule.").

Where a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial.  For the foregoing reasons, the totality of the circumstances in this case leads us to conclude that Czichray was not the subject of custodial interrogation, and that the warnings set forth in *Miranda* were not required.  We therefore reverse the district court's order granting the motion to suppress Czichray's signed statement.

-10-

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

I respectfully dissent from the judgment of the court for the reasons that follow.

## I.

In granting the motion to suppress, the district court made the following findings of fact, none of which is clearly erroneous. FBI agents, Timothy Bisswurm and Sean Boylan, called Dr. Czichray's home at 4:30 one morning, and when he answered they pretended that they had reached the wrong number. Two hours later, they knocked on his door or rang his doorbell. When Dr. Czichray did not answer, the agents telephoned him and instructed him to open the door. He did so, wearing only a t-shirt and boxer shorts, and the agents informed Dr. Czichray that they wanted to talk to him for "a few minutes." After Dr. Czichray let them come into his home, the agent's "few minutes" turned into nearly seven hours.

During this time, the agents told Dr. Czichray about their investigation into health care fraud and their belief that he was involved. When Dr. Czichray told the agents that he was late for work, they instructed him to call in sick, and when he spoke with his office, the agents further instructed him not to inform his co-workers that the FBI was interviewing him. Dr. Czichray's home and cell phones rang several times during the interview, but the agents admonished him to not answer the calls. When Dr. Czichray wanted to get dressed, Agent Boylan escorted him to the bedroom and did a quick search to ensure that there was no telephone in the room that Dr. Czichray might use to alert others about the FBI's interview. When Dr. Czichray needed to use the bathroom, a similar check was performed.

While the agents informed Dr. Czichray that he was free to end the interview at any time, they also told him that if he did not cooperate they would "light up" his world and tell insurance companies to stop making legitimate payments to his

-11-

chiropractic practice. After nearly seven hours, one of the agents wrote out a statement outlining what Dr. Czichray had said during the interview, which included an assertion that Dr. Czichray had not been "threatened, coerced, or promised ... anything." Dr. Czichray signed the statement but was never informed of his *Miranda* rights.

II.

Law enforcement officers are bound to give the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), only when a suspect is interrogated in a so-called custodial setting. *See, e.g., Oregon v. Elstad*, 470 U.S. 298, 309 (1985). In *Miranda*, 384 U.S. at 444, the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Courts do not determine whether a suspect is in custody from the perspective of the interrogator; "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In other words, the question is whether, viewing the totality of the circumstances, a reasonable person would have believed that the police curtailed his or her freedom of movement to a "degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). Admittedly, "the task of defining 'custody' is a slippery one," *Elstad*, 470 U.S. at 309, that presents mixed questions of fact and law. A court of appeals reviews a district court's custody determination *de novo*, but the underlying factual findings for clear error. *United States v. LeBrun*, 363 F.3d 715, 719 (8th Cir. 2004) (en banc).

In *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990), we identified six considerations which "either mitigate or aggravate an atmosphere of custodial interrogation." These considerations are "whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to

-12-

leave or request the officers to do so, or that the suspect was not under arrest"; "whether the suspect possessed unrestrained freedom of movement" during the interview; "whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions"; "whether strong arm tactics or deceptive stratagems were employed during questioning"; whether the atmosphere of the questioning was dominated by law enforcement officers; and "whether the suspect was placed under arrest at the termination of the questioning." *Id.* No one consideration is dispositive on the question of custody, nor must all of the matters considered weigh in favor of the defendant before a finding that the defendant was in custody is warranted. *Id.* I will address each of these considerations in turn.

With respect to the first consideration, there is no dispute that the agents informed Dr. Czichray several times that he could refuse to speak to them or could ask the agents to leave his home at any time. This weighs against a holding that Dr. Czichray was in custody.

But the restriction on Dr. Czichray's freedom of movement supports the suppression of the statement that he signed. As I have said, when Dr. Czichray announced that he was late for work, the agents, rather than permitting him to leave, directed him to call in sick. And even though he was in his own home and not at a police station, he could not go to his bedroom or bathroom unattended. The district court rejected the government's contention that the agents escorted Dr. Czichray around his home because they were concerned for their safety. Instead, the district court found that the agents' only reason for escorting Dr. Czichray was "[to] look[] for a telephone to make sure that Czichray did not place any outside calls" to alert others of the investigation.

The government relies heavily on *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002), to support its contention that requiring that an interviewee be escorted when he or she wants to visit rooms outside the interview area does not restrict the

-13-

suspect's freedom of movement. In *Axsom*, however, the police escorted the suspect about his house because they had observed numerous weapons when they entered the house to execute a search warrant. In that case we explicitly held that the absence of "unrestrained freedom of movement" was "much less significant" to a determination of whether the suspect was in custody than it otherwise would have been because a reasonable person in the suspect's "shoes should have realized the agents escorted him not to restrict his movement, but to protect themselves and the integrity of the search." *Id*. at 502-03. That was not the case here. There was no evidence to suggest that Dr. Czichray possessed weapons that he might use against himself or the agents, nor was there an ongoing search that needed protection against the destruction of evidence. And the district court found that when Dr. Czichray needed to use the bathroom, the agents asked him whether there was a phone in that room but did not inquire about weapons. The district court had ample reason to believe that the justification of officer safety was a *post hoc* invention, and to find, as it did, that the agents "true concern was preventing Czichray from communicating with anyone else." The agents thus deliberately subjected Dr. Czichray to incommunicado interrogation, a consideration that particularly concerned the *Miranda* court. *See Miranda*, 384 U.S. at 445-46.

The third consideration identified in *Griffin* also supports a finding that Dr. Czichray was in custody: No one disputes that it was the agents who approached the defendant and asked to speak with him. While Dr. Czichray allowed them to enter his home, the district court found that he did not "voluntarily acquiesce[]" to the interview, *see Griffin*, 922 F.2d at 1349. The government argues that *Axsom* precludes this conclusion, but there the defendant (who we said had voluntarily acquiesced) "was extremely friendly and cooperative during the interview" and even telephoned the FBI agents afterward to commend them for their professionalism, *Axsom*, 289 F.3d at 501-02. Here, in contrast, Dr. Czichray did not make any effort to assist in the investigation. While I would not hold that a defendant needs to be enthusiastic about an interview before the balance can tip against a finding that he or

-14-

she was in custody, I think that the mere absence of resistance is not sufficient to do so.

The magistrate judge who conducted a hearing on the suppression motion made a proposed finding, rejected by the district court, that Dr. Czichray voluntarily acquiesced because he "made no attempt to terminate the interview directly or indirectly" and allowed the interview "to proceed to its closing." *See* 28 U.S.C. § 636(b)(1)(C). There is a difference, however, between allowing an interview to continue and taking affirmative steps to make it go more smoothly. When a defendant can only be said not to be acting in a rude or uncooperative manner, the presumption that an officer-initiated interview lends weight to a finding of custody is not rebutted. I agree with the district court that Dr. Czichray's level of active cooperation was not sufficient to undermine the inferences that are properly drawn from the fact that the agents initiated contact with him. In any event, I believe that in this context the voluntariness of Dr. Czichray's actions are a matter of fact, and the district court's finding is certainly not clearly erroneous.

I also agree with the district court that it is a "close question" whether the agents used strong-arm tactics or deceptive stratagems in their interview with Dr. Czichray. They did, however, threaten to interfere with Dr. Czichray's legitimate business and to "light up his life," insinuating that they would begin investigating his elderly father unless Dr. Czichray agreed to cooperate. These threats support an inference that Dr. Czichray was in custody.

Whether the police dominated the interview is the fifth consideration under *Griffin*. While we have recognized that "[w]hen a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial," *Axsom*, 89 F.3d at 502, "a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents ... take control of a person's private residence," *Griffin*, 922 F.2d at 1355 n.15. The actions

-15-

of FBI Agents Bisswurm and Boylan, including directing Dr. Czichray not to communicate with others during the interview and not allowing him free, unaccompanied movement about his own home, demonstrate the agents' domination of the interview.

Finally, it is undisputed that the agents did not place Dr. Czichray under arrest at the conclusion of the interview. According to *Griffin*, this fact weighs against a finding that the interview took place in a custodial setting.

## III.

To determine whether Dr. Czichray was in custody, we must assess the totality of the circumstances surrounding his statement. It is important to emphasize that the considerations identified in *Griffin* are not by any means exclusive, and that the answer to the ultimate question depends on a careful evaluation of all the relevant facts. But in this case, I think that our opinion in *Griffin* directs us rather clearly to a conclusion that the district court did not err when it held that Dr. Czichray's situation entitled him to *Miranda* warnings. Only two considerations (whether Dr. Czichray was informed that he was free to end the interview and whether he was arrested at the end of the interview) tend to support a finding that he was not in custody. But actions sometimes speak louder than words. I believe that the agents' restrictions on Dr. Czichray's movements and on his access to his telephones significantly undermined any statements that they made to him about his freedom to ask them to leave or to end the interview. A reasonable person in Dr. Czichray's position would not believe that he was free to end the interview or to ask the agents to leave. Thus only one fact (the absence of an arrest at the interview's conclusion) weighs substantially in favor of the government's position, and in any event as an original proposition it is hard to see why this fact has much if any relevance to the question of whether Dr. Czichray was in custody.

-16-

I would therefore hold that Dr. Czichray was in custody when he signed the statement. While the absence of *Miranda* warnings will not require suppression when suspects volunteer inculpatory evidence during a non-custodial interrogation, they must be informed of and voluntarily, intelligently, and knowingly waive their *Miranda* rights when they are in custody, or their statements are inadmissible. *See Miranda*, 384 U.S. at 478-79. Because the written statement in the instant case was made during an "incommunicado interrogation ... in a police-dominated atmosphere ... without full warnings of constitutional rights," *id.* at 445, I would affirm the district court's order granting the motion to suppress.

_____