# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 19-3249

———————————————

United States of America

*Plaintiff - Appellee*

v.

Martell Roberts

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Southern District of Iowa - Davenport

——————————

Submitted: June 18, 2020
Filed: September 22, 2020

——————————

Before LOKEN and GRASZ, Circuit Judges, and CLARK[*], District Judge.

——————————

LOKEN, Circuit Judge.

Martell Roberts entered a conditional guilty plea to one count of being a felon in possession of a firearm and ammunition, reserving the right to appeal the denial of

———————————————

[*]The Honorable Stephen R. Clark, United States District Judge for the Eastern District of Missouri, sitting by designation.

his motion to suppress. See 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 924(a)(2). On appeal, Roberts argues the district court erred in denying his motion to suppress because (1) the search warrant being executed when he made incriminating statements was not supported by probable cause, (2) the statements should be suppressed because he was in custody and was not provided Miranda warnings, and (3) the statements were not made voluntarily. Roberts also argues the court erred in determining he is a career offender in sentencing him to 100 months imprisonment. See USSG § 4B1.1. For the reasons below, we affirm.[1]

## I. Suppression Issues

At 4:22 a.m. on July 7, 2018, two men came from behind a nearby dumpster and shot a man as he emerged from the Village Inn restaurant in Bettendorf, Iowa. After extensive investigation, a team of police officers surrounded the Davenport residence of Martell Roberts and his girlfriend, Dashala Sanders, on July 31 to execute a warrant to search the residence and a 2007 silver Dodge Durango for firearms, ammunition, shell casings, cellular phones, and a red hooded sweatshirt.

No one responded to repeated commands from the Emergency Response Unit's rescue vehicle. The vehicle's ram was used to open the door. Roberts came out and gave himself up. He was cuffed in plastic zip-ties for officer safety and placed behind the armored vehicle while the apartment was secured. The officers confirmed that only Roberts's two young children remained inside. Bettendorf Police Lieutenant John Majeske then left the search team, uncuffed Roberts, and suggested they talk in Detective Bryan Payton's unmarked police vehicle parked less than fifty feet away.

---

[1]Roberts's motion to suppress was denied by the Honorable Stephanie M. Rose. He was sentenced by the Honorable Rebecca Goodgame Ebinger. Both are United States District Judges for the Southern District of Iowa.

Roberts agreed and followed the officers to the car. Detective Payton led audio-recorded questioning regarding the Village Inn shooting.

After forty five minutes, Majeske told Roberts two firearms were found in the residence and asked where he got them. Roberts said he "guessed he was under arrest now." Majeske said he was not under arrest. Roberts admitted he brought the guns into the residence from the Durango, where "Mike" had left them. The officers noted possible federal firearm charges because they knew Roberts was a felon. Roberts said it "sounds like I'm going to jail, regardless, I'm going to jail." The officers did not arrest Roberts, but Payton read Roberts his <u>Miranda</u> rights, despite Roberts saying "you don't have to." Payton asked if Roberts wanted to continue to talk. Roberts replied, "Not really," but continued the interview. He eventually admitted driving a man he knew as "Sko" to the Village Inn on the night of the shooting in the Durango, where Sko later left the firearms. The officers arrested Roberts three hours later. They continued pressuring him to cooperate in two more hours of questioning at the Bettendorf police station without additional <u>Miranda</u> warnings.

## A. Probable Cause for the Warrant

In his motion to suppress and on appeal, Roberts first argues the evidence seized from his residence should be suppressed because there was no probable cause for the search, and his statements should be suppressed as fruit of that poisonous tree. The district court denied the motion, concluding that probable cause was established within the four corners of the search warrant and its supporting affidavit and, in the alternative, that the good-faith exception recognized in <u>United States v. Leon</u>, 468 U.S. 897, 923 (1984), would apply.

A warrant is supported by probable cause if the totality of the circumstances demonstrates "a fair probability that contraband or evidence of a crime will be found in the place to be searched." <u>United States v. Seidel</u>, 677 F.3d 334, 337 (8th Cir.

2012) (quotation omitted); see Illinois v. Gates, 462 U.S. 213, 230 (1983). Factors to consider in determining whether a warrant application sufficiently links the items to be seized with the place to be searched include "the nature of the crime and the reasonable, logical likelihood of finding useful evidence." United States v. Johnson, 848 F.3d 872, 878 (8th Cir. 2017). We review the issue of probable cause *de novo*, according great deference to the determination of the magistrate or judge who issued the warrant. United States v. Green, 954 F.3d 1119, 1123 (8th Cir. 2020). Our task is to "determine whether the warrant's issuing court had a substantial basis for finding probable cause." Id.

"When the issuing judge relied solely upon a supporting affidavit to issue the search warrant," as in this case, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999). Here, on July 25, 2018, an Assistant Scott County Attorney submitted the warrant application to a Seventh Judicial District Judge, supported by the sworn Narrative Search Warrant Application of Bettendorf Detective Sergeant Brad Levetzow. The affidavit recited that it was based on, in addition to Levetzow's personal knowledge, video surveillance of the Village Inn parking lot at the time of the July 7 shooting and the attached "investigative and police reports."

Levetzow's affidavit recited that, prior to the shooting, two females were in the Village Inn restaurant with two suspects. One suspect arrived in a tan Ford Mustang belonging to Antoine Flournoy, the other in a silver Nissan Altima belonging to Flournoy's girlfriend, Tennille Davis. "Both show 5901 Elmore Ave. #I6, Davenport as their address." When the victim arrived, the suspects canceled their food order, moved their vehicles out of view from the Village Inn parking lot, and waited in their vehicles for eleven minutes. A silver Dodge Durango arrived and drove through the parking lot to where the other two vehicles were parked. The Durango reappeared, drove through the parking lot, and dropped off suspect #1, a man dressed in a red

hooded sweatshirt.  Suspect #1 ran to a dumpster, joined suspect #2, and both men shot the victim as he left the Village Inn and walked to his vehicle.  The shooters fled and were picked up by the Durango, which drove back to the shooters' vehicles.  All three vehicles then drove off together, turning north onto Interstate 74.

The affidavit further recites:  (1) Flournoy's Mustang was stopped  by Moline police on July 23.  Flournoy was cited for no valid license, released, and was picked up by the Nissan Altima. (2) When stopped, Flournoy was being followed by a silver Dodge Durango registered to Sanders at 5901 Elmore Ave. #R1, Davenport.  The Durango was stopped, and the officer later identified the driver as Roberts, whose address is also 5901 Elmore Ave. #R1, Davenport.  (3) Flournoy's Mustang was towed and ammunition was found in the trunk. (4) Police records show a May 17 traffic stop in Davenport in which Roberts and Flournoy were in the Durango.

The affidavit states that this information indicates the Mustang, Altima, and Durango "are related to our shooting," and it indicates "relationships by address and involvements between" Flournoy and Davis, Roberts and Sanders, and Flournoy and Roberts.  In addition, the July 7 video indicates the three vehicles "met up prior to the shooting and fled the area together.  In order for this to happen there needed to be communication between the involved parties by the use of cellular phones."  The application requested a warrant to search the Dodge Durango and "5901 Elmore Ave. #R1, Davenport, IA" for firearms, ammunition, cell phones, and the red sweatshirt. The District Judge issued the warrant, reciting that the items to be seized are property used or possessed with intent to be used to commit an offense or concealed to prevent discovery of an offense, and property "relevant and material as evidence in a criminal prosecution."  A team of officers executed the warrant on July 31.

On appeal, Roberts argues the application failed to establish sufficient nexus between evidence to be seized and the place to be searched because nothing in the affidavit suggested that Roberts was in the Durango at the time of the shooting or that

any contraband or evidence of a crime would be found in Roberts's possession. "The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." Seidel, 677 F.3d at 338 (cleaned up). We agree with the district court that the detailed affidavit provided the warrant-issuing judge "a substantial basis for finding probable cause." Green, 954 F.3d at 1123.

The surveillance video established that a silver Dodge Durango was at the Village Inn shooting and drove one shooter in a red hooded sweatshirt to a place from which he ran to the dumpster and shot the victim. The Durango picked up the shooters as they fled, and -- joining the Mustang and Altima -- left the scene. Police records established that Roberts was driving a silver Durango as it followed Flournoy's Mustang on July 23, and that Flournoy was with Roberts when the Durango was stopped in May. Roberts lived with Sanders at the Elmore address. The address for Flournoy and Davis was a different unit at the same address. This information gave the issuing judge probable cause to believe that Roberts drove the Durango on the night of the shooting, and that evidence of the crime that had not yet been discovered -- the firearms, ammunition, red hooded sweatshirt, and cell phones used to communicate between the shooters and the driver of the Durango -- would be found in the Durango or in the residence Roberts shared with Sanders. See United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975) (people generally keep firearms at home or on their person). Thus, the totality of the circumstances found within the four corners of the search warrant affidavit created "a fair probability that contraband or evidence of a crime will be found in the place[s] to be searched." Seidel, 677 F.3d at 337.

As we conclude the issuing judge had probable cause to issue the warrant, we need not consider the district court's alternative ruling that evidence seized in the warrant search would not be suppressed because the good faith exception applies. See generally United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007). Nor need

we consider Roberts's contention that his incriminating statements were fruit of an unlawful warrant search.

## B. The Statements Issues

Roberts moved to suppress statements he made while being questioned in Detective Payton's vehicle as his residence was being searched.  He argues that he was interrogated while in custody without being provided the constitutionally required <u>Miranda</u> warnings, and that all his incriminating statements in the vehicle and later at the Bettendorf police station were involuntarily obtained in violation of his due process rights.  Lieutenant Majeske and Detective Payton testified at the suppression hearing.  The district court found both to be credible.  The record also included the audio recording of nearly seven hours of conversation between Roberts and the officers in Payton's vehicle and at the police station.  The court concluded that Roberts was not in custody prior to the time when Detective Payton gave him <u>Miranda</u> warnings and that his statements were not involuntary.

1.  <u>The Custody Issue.</u>  Law enforcement officials must administer <u>Miranda</u> warnings before interrogating persons in their custody. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  Here, the officers in testifying generally described their lengthy questioning of Roberts as an interview of a potential witness to the shooting.  But it is undisputed that their questioning in the police vehicle was interrogation under <u>Miranda</u>, so the issue is whether Roberts was in custody. <u>See, e.g.</u>, <u>United States v. Bordeaux</u>, 400 F.3d 548 (8th Cir. 2005).  We review the district court's factual findings for clear error and its legal conclusions, including the question of custody, *de novo*.  <u>United States v. LeBrun</u>, 363 F.3d 716, 719 (8th Cir. 2004) (en banc) (standard of review), <u>cert. denied</u>, 543 U.S. 1145 (2005).

Absent formal arrest, the police must give <u>Miranda</u> warnings when a suspect's freedom of movement is restricted to a degree akin to a formal arrest.  <u>California v.</u>

Beheler, 463 U.S. 1121, 1125 (1983). The issue turns on whether a reasonable person in the suspect's shoes would have felt free to end the interview. United States v. Vinton, 631 F.3d 476, 481 (8th Cir.), cert. denied, 565 U.S. 866 (2011). We consider the totality of the circumstances confronting the defendant. United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005). The inquiry typically focuses on six non-exclusive factors enumerated in United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir 1990), which the district court considered in this case. However, "it is important to recall that the [Griffin] factors are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance." Czichray, 378 F.3d at 827.

"The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." Griffin, 922 F.2d at 21349. This is "powerful evidence that a reasonable person would have understood that he was free to terminate the interview." Czichray, 378 F.3d 826. This principle is of particular importance in a case such as this, where the questioning occurred during the execution of a warrant search that involved a high risk to officer safety, the investigation of a shooting crime. Some Griffin factors that suggest a suspect is in custody in other circumstances are inherent in this situation. The police are there in numbers and armed; the place to be searched had to be forcefully entered when no one responded; and Roberts when he emerged was flex-cuffed and escorted away from the premises for the officers' and his own safety. See United States v. Williams, 760 F.3d 811, 815 (8th Cir. 2014).[2] Moreover, it is well established that the police may detain persons found in the home for the duration of the search to

_____

[2]Even in less dangerous circumstances, handcuffing for officer safety and supervision during an interview do not render the interrogation custodial. See United States v. Giboney, 863 F.3d 1022, 1028 (8th Cir.), cert. denied, 138 S. Ct. 527 (2017); Czichray, 378 F.3d at 825, 830; United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006), cert. denied, 549 U.S. 1272 (2007).

"prevent flight in the event that incriminating evidence is found" and facilitate "the orderly completion of the search." Michigan v. Summers, 452 U.S. 692, 702-03 (1981); see L.A. Cty. v. Rettele, 550 U.S. 609, 613-14 (2007); Muehler v. Mena, 544 U.S. 93, 98-99 (2005). Depending on the totality of the circumstances, questioning of those being detained during a warrant search may or may not cross the line and become custodial interrogation requiring Miranda warnings. See United States v. Burns, 37 F.3d 276, 280-81 (7th Cir. 1994), cert. denied, 515 U.S. 1149 (1995) (no custody). But the remaining Griffin factors, though relevant, are of little help in drawing that line. When interviewing a person present during a warrant search, efforts by the officers to assure the person that he is not under formal arrest or obligated to answer questions become even more significant than in the more typical witness interview. See United States v. Sutera, 933 F.2d 641, 646-48 (8th Cir. 1991).

Here, the recorded questioning makes clear that both Lieutenant Majeske and Detective Payton repeatedly assured Roberts he was not under arrest and could stop the questioning at any time, and that Roberts understood his freedom to do so. At the start of the questioning, the officers assured Roberts he was not under arrest, that he did not need to talk to the officers, and that he could stop at any time. "[W]hile advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine." United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006).

After forty five minutes, Majeske told Roberts firearms were found in the residence, and Roberts said he "guessed he was under arrest now." Majeske again said he was not under arrest. Later, after Sanders returned, Payton moved his vehicle directly in front of the Davenport residence. Sanders knocked at the passenger window, where Roberts was sitting, and asked Payton if Roberts was under arrest. Payton again said he was not under arrest and agreed to Sanders's request that she speak with Roberts outside the vehicle. As in Bordeaux, after a three-minute private conversation with Sanders, Roberts walked back and reentered the vehicle. 400 F.3d

at 559. Lieutenant Majeske returned to the vehicle and suggested they continue the interview at the station because a news van was searching the scene. Roberts objected, Payton said it was up to Roberts, and questioning continued in the vehicle.

Roberts argues these assurances did not negate the perception Roberts was in custody because the officers did not tell him "you are free to leave at any time." In many situations, that may be an effective way to tell a person he is not under formal arrest. But being free to leave may not necessarily be accurate when officers have discretion to detain a person during execution of a warrant search. Cf. United States v. New, 491 F.3d 369, 373-74 (8th Cir. 2007) (immobile hospital patient not in custody when told he was free to terminate the interview). Of course, there is discretion to end detention of persons present during a warrant search. But when a person is lawfully detained, the assurances the officers repeatedly gave Roberts -- you are not under arrest and may stop answering our questions at any time -- are likely sufficient to refute the notion he is in custody under Miranda. As we said in Czichray, "[a]gainst a backdrop of repeated advice that he was free to terminate the interview, [Roberts's] decision not to terminate the interview . . . suggests an exercise of free will, rather than restraint to a degree associated with formal arrest." 378 F.3d at 829, citing Yarborough v. Alvarado, 541 U.S. 652, 655-58, 663-65 (2004).

Roberts further argues the interrogation was coercive because the officers emphasized he had a lot to lose if he did not cooperate as a witness, including his children and his job. But the interrogation did not become custodial simply because the officers "advise[d] [Roberts] of the potential course[s] and consequences of a criminal investigation," letting him weigh his options and make an informed decision whether cooperation that involved incriminating disclosures might be in his best interest. Czichray, 378 F.3d at 829. The officers spoke in a conversational tone, repeatedly emphasizing it was Roberts's decision whether to cooperate.

For these reasons, we agree with the district court that Roberts was not in the officers' custody when he made incriminating statements prior to being given <u>Miranda</u> warnings after he was told firearms were found in his residence.

2. The Voluntariness Issue.  Roberts further argues that his incriminating statements must be suppressed because they were not voluntary.  A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.  <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1132 (8th Cir.), <u>cert. denied,</u> 534 U.S. 924 (2001).  Voluntariness is determined based on the totality of the circumstances.  <u>LeBrun</u>, 363 F.3d at 724.

Roberts argues his statements were involuntary because the officers pressured him to cooperate by offering to help him avoid eviction if he cooperated, made it clear the only way to avoid arrest and potential prosecution as a shooter was to cooperate, confronted him with the possibility of federal charges and losing his children and his job, and halted the arrest process during the interrogation because Roberts "had more he wants to say."  We agree with the district court that none of these tactics amounted to improper threats or promises that overbore Roberts's will.  As the officers testified, they believed Roberts drove the Durango the night of the shooting but did not shoot the victim.  Therefore, in the interview, they tried to persuade Roberts to become a witness against the shooters and put psychological pressure on him to do so.  Roberts understood his rights and carefully weighed the risks and benefits of incriminating cooperation throughout the protracted interview, showing that his will was not overcome at any point.  <u>See</u> <u>Simmons</u>, 235 F.3d at 1133-34.  Absent improper threats, use of physical force, or intimidation tactics, psychological pressure almost never renders a confession involuntary.  <u>See</u> <u>Lebrun</u>, 363 F.3d at 724; <u>Jenner v. Smith</u>, 982 F.2d 329, 334 (8th Cir. 1993).

The district court properly denied Roberts's motion to suppress.

-11-

## II. The Sentencing Issue

Roberts argues the district court erred in determining he is a career offender because he has two prior convictions for a crime of violence or a controlled substance offense. USSG § 4B1.1(a). Based on this court's controlling precedent, the court determined that Roberts has two prior convictions for controlled substance offenses, a prior Illinois conviction for manufacture or delivery of a controlled substance, 720 ILCS 570/401(c)(2), and a prior Iowa conviction for possession with intent to deliver cocaine base, Iowa Code § 124.401(1)(C). We review these determinations *de novo*. United States v. Maldonado, 864 F.3d 893, 897 (8th Cir. 2017).

Roberts argues his Illinois conviction did not qualify because the statute criminalizes inchoate offenses, making it categorically overbroad. We have rejected this argument repeatedly and are bound by these prior decisions. United States v. Mendoza-Figueroa, 65 F.3d 691, 694 (8th Cir. 1995) (en banc); United States v. Merritt, 934 F.3d 809, 811 (8th Cir. 2019); United States v. Davis, 801 F. App'x 457 (8th Cir. 2020).[3]

Roberts argues the Iowa conviction was not for a controlled substance offense because the Iowa law governing attempt offenses is overbroad. We rejected this argument in United States v. Boleyn, 929 F.3d 932 (8th Cir. 2019). Roberts urges us to overturn Boleyn, but only the court en banc may do so. See United States v. Meeks, 639 F.3d 522, 529 (8th Cir. 2011).

The judgment of the district court is affirmed.

_____

---

[3]Roberts first argues on appeal that the statute is overbroad because it includes controlled substances not included in the federal definition. We decline to consider this argument. See United States v. Rees, 447 F.3d 1128, 1130 (8th Cir. 2006).