# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-3381

_____

United States of America

*Plaintiff - Appellee*

v.

Ryan Isiah Thompson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 18, 2020
Filed: October 1, 2020

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

KELLY, Circuit Judge.

Ryan Thompson entered a conditional plea of guilty to one count of possession with intent to distribute heroin and one count of possession of a firearm in furtherance

of a drug trafficking crime and reserved his right to appeal the district court's[1] denial of his motions to suppress. Finding no basis for reversal, we affirm.

## I.

In early February 2018, a person identified in the record as ABC contacted St. Paul Police Department Officer Shawn Longen with information that Thompson was involved in heroin trafficking and that he also had firearms. More specifically, ABC told Longen the following:

- Thompson drove his car and took bus trips from St. Paul to Chicago to pick up heroin for distribution in St. Paul.
- Thompson had been arrested in Illinois and Minnesota for drug-related crimes.
- Thompson lived at 677 Wells Street and had "a couple of firearms" in the apartment.
- Thompson drove a silver van and a green Nissan Maxima with the license plate AKS 918.

ABC also shared with Longen a video he had taken of Thompson in Thompson's apartment. The video showed stacks of money on a black case, a black handgun, a second firearm, and Thompson sitting on a couch with baggies containing "what appeared to be controlled substances."

Longen followed up on ABC's information by confirming Thompson's age, which ABC had discussed, and checking information about the green Nissan, which he learned was registered to Thompson, although not at the 677 Wells address. He also confirmed that Thompson had been arrested in Illinois and Minnesota for drug-

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota, adopting in part the report and recommendation of the Honorable Katherine Menendez, United States Magistrate Judge for the District of Minnesota.

related offenses. When Longen showed an unlabeled photo of Thompson to ABC, ABC identified the person in the photo as Thompson. Longen then began conducting surveillance at 677 Wells, where he saw Thompson driving the green Nissan.

In late February 2018, ABC told Longen that Thompson had recently been stopped by the Wisconsin State Patrol (WSP). Longen contacted the WSP and verified that Thompson had been stopped while driving the green Nissan and was arrested for possession of marijuana. ABC also gave Longen an audio recording of a conversation he had with Thompson in which Thompson talked about the WSP traffic stop. In the audio, Thompson said that he had marijuana in the car and on his person, and that it would have been "much worse . . . if he would have had the work with him." In this conversation, Thompson also discussed "licks" and "zips," and said he had a "whoop" locked inside the glove box at the time of the stop.[2]

On February 28, 2018, Longen applied for a search warrant to place a GPS tracking device on Thompson's green Nissan. On the same day, Longen also applied for an "order" authorizing "the installation and use of a pen register, trap device, and electronic tracking device to include GPS location and Real Time Tool Data (RTT)"[3] for a cell phone number ending in 0727, a number ABC said Thompson used in connection with drug trafficking and to communicate with ABC.

A state court judge granted the warrant authorizing the GPS tracking device and issued the requested order for the 0727 cell phone number. In the order, the issuing judge found, "on the basis of the information submitted by the applicant, that

---

[2]Longen testified at the evidentiary hearing that "work" was a common term for drugs; that "licks" was a common term for customers; that "zips" was slang for ounces; and that "whoop" was slang for a gun.

[3]The parties do not provide a definition of RTT or an explanation of its purpose.

there is probable cause to believe that the information likely to be obtained by such installations and use is relevant to ongoing criminal investigation into possible violation(s) by RYAN ISIAH THOMPSON (DOB XX/XX/XXXX) for facilitating the distribution of heroin in the Twin Cities metropolitan area." It further provided that law enforcement:

> may install and use a pen register, trap and trace device, and electronic tracking device to include GPS location, and Real Time Tool Data (RTT) . . . [to] track the location and/or movement of the phone for the time period of February 28, 2018 and extending sixty (60) days past the date of this Order; and to provide the following information:
>
> 1. Stored Voice Message(s)/Voice mail
> 2. Stored SMS and MMS data, Text of Text, or other stored messaging data and images;
> 3. Provide a "Locator Tool which uses Precision Location and GPS, based on Probable Cause";
> 4. Cell site activations;
> . . .
> 10. An engineering map, showing all cell-site tower locations/addresses, sector and orientations;
> 11. The physical address/location of all cellular towers in specified market

ABC continued to provide information throughout March 2018. He updated Longen on Thompson's daily activities and said that Thompson would be making a trip to Chicago soon to pick up heroin. On March 5, 2018, GPS tracking data showed the green Nissan traveling to Chicago, remaining there for approximately 20 minutes, and then returning west toward St. Paul. Based on this information, St. Paul police officers stopped the car. They called for a drug-detection dog, and the dog alerted to

the center console. Officers searched but found nothing, and Thompson was allowed to leave.

On March 6, 2018, ABC gave Longen another audio recording. In this 20-30 minute recording, Thompson discussed the March 5 traffic stop. He said he thought he was under investigation and that law enforcement might be monitoring his phones. He suspected that people were informing on him and discussed the need to distance himself from others, including ABC. Thompson also mentioned "letting things cool off" for 90 days because that was the amount of time he thought "they have [] to investigate me," and he talked about how "he picked up on the surveillance vehicles that were following him on I-94." He was worried when the drug-detection dog alerted on the car because he had "a whole hundred" on him. He thought that the reason the officer was unable to feel where he had hidden the heroin was because the officer wore gloves. He also bragged that his product was "the best dope for the cheapest price."

In early March, ABC became a paid informant. Shortly thereafter, he told Longen the reason he was providing information was that he wanted Longen's help in reducing his probation term.

Also in early March, ABC told Longen that Thompson had purchased a newer, silver Nissan Maxima with tinted windows. According to ABC, Thompson decided to leave the green Nissan in Chicago because law enforcement had already stopped that car twice. ABC also said Thompson had a new cell phone number ending in 3045. Based on this information, Longen applied for a warrant to install a GPS tracking device on the silver Nissan and for an "order" to permit tracking of the 3045 number. On April 2, 2018, a state court judge approved both applications and issued the related warrant and order. The applications for the warrant for the silver Nissan and the order for cell phone number 3045 included information Longen had gathered since February 28, but were otherwise nearly identical to those submitted for the

green Nissan and for cell phone number 0727. Longen placed the tracker on the silver Nissan on April 5.

Thompson subsequently made several trips to Chicago. On April 13, GPS tracking showed that Thompson drove to the St. Paul bus station, and surveillance video showed him boarding a Megabus to Chicago. On April 16, Thompson returned to the St. Paul bus station, got into the silver Nissan, and drove away. Tracking information also showed that the silver Nissan traveled to Chicago on April 20 and returned on April 22. On May 3, Thompson took another trip to Chicago on a Megabus. Based on the phone tracking, law enforcement determined that he remained in Chicago for a few days before traveling toward St. Paul.

Officers believed Thompson would be returning to St. Paul with heroin he picked up in Chicago. On May 6, 2018, Longen and other officers set up surveillance at the St. Paul bus station to watch for Thompson's return. Officers saw Thompson exit a Megabus with a sling-style bag and then get into the driver's seat of the silver Nissan. A woman, who had driven the car to the station, moved over to the passenger seat. The two drove away from the station.

Longen decided to stop Thompson's car and asked Officer Whitney to conduct the stop. Longen informed Whitney in advance that Thompson was known to carry firearms and that he was suspected of possessing heroin.

Whitney stopped Thompson minutes after he left the station. Whitney told Thompson he stopped him because his car had tinted windows and no license plates. He then asked Thompson "[w]here you guys comin' from?" Thompson responded that he had just dropped off his young daughter and that he and his passenger, JLJ, were going to get something to eat. Whitney asked Thompson to turn off his engine because he was having trouble hearing him.

Whitney then asked Thompson to "step out" of the car and said "you're not under arrest or anything at this point." He "pat-searched" Thompson for weapons and found none. He did not read Thompson his rights pursuant to Miranda.[4] Whitney asked Thompson if there was anything illegal in the car, and Thompson responded there was not. Whitney also asked JLJ to "step out" of the car and he explained to Thompson that he was "just gonna run the dog around the car." Thompson objected, saying "this is an illegal search and seizure." Before the dog-sniff, the following exchange took place:

> Whitney: But if there's nothin' in the car for you to worry about . . . then it's all good and then you'll be on your way in five seconds.
>
> Thompson: Well, this is what I was gonna to say.
>
> Whitney: Yep.
>
> Thompson: My girls have their guns license.
>
> Whitney: A what?
>
> Thompson: She has a gun license.
>
> Whitney: Okay. Is there a gun in the car?
>
> Thompson: Yeah, but she has a gun license.
>
> . . .
>
> Whitney: Where is that? Where's the gun at?
>
> Thompson: It's in the front seat in her bag.

---

[4]See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

The drug-detection dog circled the car but did not alert. When Longen arrived, however, he found heroin hidden near the car's center console. Whitney found a firearm in the sling-style bag near the front seat. Thompson was arrested.

Longen then applied for and obtained another search warrant, this time for the residence at 677 Wells. There, officers found a handgun, extended magazines, the black case seen in the video ABC took of Thompson, a bullet-style mixer with a white residue inside it, ammunition, and documents linking Thompson to the apartment.

Thompson moved to suppress the evidence seized pursuant to both GPS vehicle warrants, both cell phone tracking orders, the May 6 traffic stop, and the search of his apartment. He also moved to suppress statements he made during the traffic stop. The district court determined that probable cause supported the warrants and orders and that, in any event, the Leon good-faith exception would apply. It denied in part Thompson's motion to suppress his statements.[5] Thompson appeals.

## II.

When reviewing a district court's decision on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Clay, 646 F.3d 1124, 1127 (8th Cir. 2011). We also review de novo the district court's application of the Leon good-faith exception to the exclusionary rule and may consider the applicability of the good-faith exception before reviewing the existence of probable cause. Id.

---

[5]The district court suppressed several of Thompson's statements that it determined were elicited in violation of Thompson's Miranda rights. The government has not appealed that ruling.

## A.

Thompson argues that both GPS vehicle warrants lacked probable cause. The affidavits[6] in support of both warrants included information that Thompson was "involved in the sale and distribution of heroin." They provided the address where Thompson sold and stored heroin and described weekly trips to Chicago to "pick up a large amount of heroin from a source." Thompson contends that the warrant applications relied "entirely on the untested word of a concerned citizen with whom Officer Longen had never worked before," and thus lacked a substantial basis for finding probable cause.

It is true that neither application provided information about who ABC was or why ABC was providing information to law enforcement. Nor did they describe why Longen considered ABC to be reliable. See United States v. Faulkner, 826 F.3d 1139, 1144 (8th Cir. 2016). But the applications included details about Thompson that Longen was able to corroborate, including Thompson's age and appearance, his address, and the car he was driving. Through surveillance, Longen confirmed that Thompson was driving first the green Nissan and then the silver Nissan. ABC also told Longen that Thompson had a prior drug-related criminal history, which Longen was able to confirm, and this information was included in both applications. The application for the silver Nissan included additional corroboration for ABC's information and said that the green Nissan had been seen in an area of Chicago controlled by individuals involved in heroin distribution. We note that the magistrate judge described the warrant applications for the vehicles as "thin." But we agree that, giving due deference to the issuing judge, the warrants were supported by adequate probable cause. See id. at 1145 (giving deference to the magistrate judge and finding the warrants were proper but noting that it was "a close call").

---

[6]The affidavit for the silver Nissan largely duplicated the affidavit for the green Nissan, with the addition of information gained through further investigation and information about the purchase of the silver Nissan.

Even if the warrants lacked probable cause, however, the <u>Leon</u> good-faith exception applies to the vehicle warrants. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897 (1984). Under the good-faith exception, evidence should be suppressed "only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause." <u>United States v. Gibson</u>, 928 F.2d 250, 254 (8th Cir. 1991). Courts must "look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." <u>United States v. Jackson</u>, 784 F.3d 1227, 1231 (8th Cir. 2015). Courts must also "look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge" when assessing good-faith. <u>United States v. Marion</u>, 238 F.3d 965, 969 (8th Cir. 2001) (cleaned up).

According to Thompson, Longen could not have reasonably believed the warrant was valid. He argues that Longen's applications inaccurately referred to ABC as a "concerned citizen" and omitted ABC's criminal history, status as a paid informant, and desire to obtain a shorter probationary period for his cooperation—all to bolster ABC's credibility. Thompson also alleges that Longen failed to conduct controlled buys from him and that, based on his 18 years of experience as an officer, "Longen should have known that his search warrant application did not have probable cause to monitor the location of Mr. Thompson's vehicles." <u>See</u> <u>Leon</u>, 468 U.S. at 923 (good-faith exception does not apply if the warrant is so facially deficient that no police officer would reasonably presume the warrant to be valid).

Thompson's arguments are not enough to show that Longen lacked an objectively reasonable belief that probable cause existed for the vehicle warrants. <u>See</u> <u>Gibson</u>, 928 F.2d at 254. Prior to seeking the warrants, Longen watched a video of Thompson at his apartment with firearms and what appeared to be baggies of controlled substances. He also heard a recording of Thompson discussing his WSP stop and how Thompson was glad he had no "work" in the car. After the warrant for

the green Nissan was issued, ABC provided another recording in which Thompson discussed how he had drugs in the car during the March traffic stop and that he had "the best dope." Although Longen did not include information he learned from the video and recordings in his applications, as the district court noted, "[t]he videos and audio recordings strongly bolstered Officer Longen's belief in the validity of the warrant[s]."

Longen also reasonably believed that ABC was a reliable informant. ABC personally observed Thompson with heroin and had firsthand knowledge of his movements. See United States v. Ellison, 793 F.2d 942, 946 (8th Cir. 1986) (finding it significant that the informants personally observed the reported activity). ABC also provided Longen with video evidence that supported his information. See United States v. Solomon, 432 F.3d 824, 828 (8th Cir. 2005) (noting the informant "provided the officers with printed-out photos from Solomon's bedroom consistent with the photos she had previously described"). In addition, Longen met ABC in person, which can "strengthen an officer's decision to rely on the information provided." United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996).

Thompson also challenges the constitutionality of the cell phone orders. He reminds us that law enforcement needs a warrant based on probable cause to access cell phone location records. See Carpenter v. United States, 138 S. Ct. 2206, 2221 (2018). Here, Longen obtained "orders," not warrants. Moreover, the cell phone orders cite authorizing statutes that require a standard lower than probable cause for the information they seek. See 18 U.S.C. § 3123(a) (requiring certification by the applicant "that the information likely to be obtained . . . is relevant to an ongoing criminal investigation"); 18 U.S.C. § 2703(d) (requiring "specific and articulable facts showing that there are reasonable grounds to believe that the . . . information sought[ is] relevant and material to an ongoing criminal investigation"); Minn. Stat. § 626A.37 (requiring a finding "that there is reason to believe that the information likely to be obtained . . . is relevant to an ongoing criminal investigation"). See also

Carpenter, 138 S. Ct. at 2221 (showing required for a search pursuant to § 2703(d) is a "'gigantic' departure from the probable cause rule").

We agree that probable cause was required for the cell phone orders. See Riley v. California, 573 U.S. 373, 386 (2014). But even if the cell phone orders lacked probable cause, that is, "a fair probability that contraband or evidence of a crime will be found in a particular place," we agree with the district court that the good-faith exception applies. See Illinois v. Gates, 462 U.S. 213, 238 (1983). Thompson does not challenge this ruling on appeal. Nevertheless, we note that Carpenter had not yet been decided at the time Longen applied for the cell phone orders. Longen used an application form that would soon be out of date, but the application he used included the words "probable cause," and it was reasonable for him to rely on the various statutes cited in the orders as authorization. See Illinois v. Krull, 480 U.S. 340, 354-55, 360 (1987). This, coupled with the evidence from ABC and the investigation concerning Thompson's use of his phones and his travels, leads us to conclude that Longen reasonably believed probable cause existed for the cell phone orders.

B.

Next Thompson argues that officers lacked probable cause to stop and search his car or to arrest him on May 6 because Longen relied "solely . . . on information from the informer" that Thompson was trafficking heroin and had no corroborating evidence supporting these allegations. To the contrary, we agree with the district court that law enforcement had probable cause to stop and search the car based on the evidence obtained from the investigation. Prior to this time, officers had verified information provided by ABC, conducted independent surveillance of Thompson, and tracked his movements over several weeks. They also had knowledge of the video and audio recordings of Thompson that ABC had provided. In sum, the evidence

gathered over the course of the investigation was sufficient to establish probable cause. Once the officers found heroin in Thompson's car, they had probable cause to arrest him.[7]

C.

Thompson argues that the statements he made during the May 6 traffic stop should be suppressed because he made them while in custody without being provided with <u>Miranda</u> warnings.[8] Miranda requires that before custodial interrogation, a person be advised of their right to be free from compulsory self-incrimination and to assistance of counsel. Miranda, 384 U.S. at 444. Statements made during custodial interrogation are generally suppressed if no Miranda warnings were provided. See id. It is undisputed that Thompson was not read Miranda warnings before he made the statements at issue.

Thompson's only argument on appeal is that because he was in custody, all of his statements should be suppressed. As relevant on appeal, the district court determined that three sets of statements were admissible. First, we consider the statements Thompson made during the initial minutes of the stop before he got out of the car. We agree with the district court that these statements were admissible

---

[7]Thompson also argues that the stop and search of his car and his subsequent arrest were fruits of the unlawful warrants and orders. Because we conclude that the warrants and orders were lawful, this argument necessarily fails. Thompson further argues that the search warrant for his home was fruit of the illegal May 6 traffic stop and search. Because we conclude that the traffic stop and search were supported by probable cause and were not fruits of unlawful warrants or orders, this argument also fails.

[8]Thompson also argues that his statements should be suppressed as fruits of the unlawful traffic stop. Because we conclude that the traffic stop and search of the car were supported by probable cause and were not fruits of unlawful warrants or orders, this argument necessarily fails.

-13-

because a person would not have reasonably believed he was in custody at that time. See United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) ("Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way."). An ordinary traffic stop does not constitute custody for purposes of Miranda because "a traffic stop is presumptively temporary and brief" and "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." Berkemer v. McCarty, 468 U.S. 420, 437–38 (1984). While Thompson was in the car, there was insufficient indication that his "freedom of action" had been "curtailed to a degree associated with formal arrest." See Griffin, 922 F.2d at 1347 (cleaned up). At that point, Whitney had stopped Thompson for only a few minutes and asked him fairly routine questions, such as where he had been and where he was going. See Berkemer, 468 U.S. at 439 (noting that officers may ask "a moderate number of questions to determine [the person's] identity and to try to obtain information confirming or dispelling the officer's suspicions" during a typical traffic stop).

Second, we consider Thompson's responses to the questions, "Is there anything illegal in the car," "Is there a gun in the car," and "Where's the gun at?" We agree with Thompson that he was in custody when he made these statements. But the district court concluded that the statements were nevertheless admissible under the public-safety exception. See New York v. Quarles, 467 U.S. 649, 657 (1984) (determining that the "need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"). We agree, and Thompson offers no argument to the contrary.

Third, Thompson made statements about a gun license after he exited the car. Whitney, before sending the drug-detection dog around the car, said "if there's nothin' in the car for you to worry about . . . then it's all good and then you'll be on your way in five seconds." Thompson then stated, "Well, this is what I was gonna

-14-

say. My girls have their gun license." Without addressing whether Thompson was in custody, the district court found these statements were voluntary. See United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995) ("A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings." (cleaned up)). Thompson makes no argument on appeal that this ruling was in error.

## III.

We affirm the judgment of the district court. Thompson has filed a motion for leave to file a pro se supplemental brief "to provide additional legal authority regarding the issues presented for appeal." Finding the counseled briefing adequate in this regard, the motion is denied.

_____