# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3565
_____

United States of America

*Plaintiff - Appellee*

v.

Michael Joe Johnson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Eastern

_____

Submitted: June 16, 2022
Filed: July 13, 2022

_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.

_____

GRUENDER, Circuit Judge.

After a jury trial, Michael Joe Johnson was convicted of sexually abusing an incapacitated individual in violation of 18 U.S.C. § 2242(2)(B). Johnson appeals, challenging the district court's[1] denial of his motion to suppress certain statements

---

[1]The Honorable Peter D. Welte, Chief Judge, United States District Court for the District of North Dakota.

made to law enforcement and the sufficiency of the evidence supporting his conviction. We affirm.

**I.**

On May 6, 2019, J.W.S. reported to law enforcement that Johnson, her half-brother, had performed a sex act on her the previous day while she was asleep at his home after a night of drinking. J.W.S. explained that she awoke as Johnson was completing the sex act.

Later that day, Bureau of Indian Affairs Agents Raymond Cavanaugh and Randy Vivier went to Johnson's home and knocked on the door. Johnson opened the door, and the agents said that "[they] needed to talk with him about allegations" against him. The agents "asked if he would come out with [them] and talk." Johnson agreed and accompanied the agents to their vehicle. Agent Cavanaugh sat in the driver's seat, Johnson sat in the front passenger seat, and Agent Vivier sat in the back. At no point did the agents place Johnson in handcuffs or otherwise physically restrain him.

Once inside the vehicle, the agents informed Johnson that his half-sister had reported that he had sexually assaulted her. Johnson denied the allegation. He explained that J.W.S. and a friend had visited Johnson's home the night before the alleged assault and that J.W.S. had been drinking. Eventually, the friend left, but J.W.S. remained and slept in one of the home's bedrooms. According to Johnson, "he was never around" J.W.S. after she went to bed. Johnson specifically denied having sex with J.W.S.

The agents then asked Johnson if he had any questions for them. Johnson indicated that he did not. Johnson opened the passenger-side door, which had remained unlocked throughout the interview, and exited the vehicle. Before the agents left, they requested a DNA sample, and Johnson agreed to provide one.

The agents sent Johnson's DNA sample as well as vaginal swabs collected from J.W.S. to a crime lab for testing. The vaginal swabs tested positive for the presence of semen, and the DNA in the semen matched the DNA in Johnson's sample.

After receiving the DNA test results, Agents Cavanaugh and Vivier asked Johnson for a follow-up interview. Johnson agreed. Again, the interview took place in the agents' vehicle, with Agent Cavanaugh in the driver's seat, Johnson in the front passenger seat, and Agent Vivier in the back. The agents did not place Johnson in handcuffs or otherwise physically restrain him. The vehicle's doors and windows remained unlocked, and at one point Johnson rolled down the passenger-side window.

The agents informed Johnson about the DNA test results. Johnson acted "surprised" and "denied that . . . it could be him." Once again, the agents gave Johnson an opportunity to ask them questions. When the interview ended, Johnson exited the vehicle on his own accord.

Johnson was charged with violating 18 U.S.C. § 2242(2)(B), which prohibits "knowingly . . . engag[ing] in a sexual act with another person if that other person is . . . physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act." Johnson pleaded not guilty and moved to suppress the statements he made during his two interviews with the agents. The district court denied the motion.

At trial, J.W.S. repeated under oath her allegation that she awoke to Johnson completing a sex act on her. Johnson testified that he did have sex with J.W.S. but that it was "consensual" and that, "[i]n fact, she initiated the entire act." By the time Johnson testified, the jury had already heard the recordings of the interviews where Johnson denied having sex with J.W.S. Johnson explained that he lied during the interviews because he was "embarrassed" and did not want his girlfriend to learn

that he had sex with J.W.S. The jury found Johnson guilty, and the district court denied Johnson's motion for a judgment of acquittal. Johnson appeals.

## II.

Johnson raises two issues on appeal. First, he challenges the denial of his suppression motion. Second, he challenges the denial of his motion for a judgment of acquittal.

## A.

We review the denial of a suppression motion *de novo* as to legal conclusions and for clear error as to factual findings. *United States v. Thompson*, 976 F.3d 815, 821 (8th Cir. 2020). Where, as here, law enforcement officers interrogated the defendant without providing him *Miranda* warnings, the defendant is generally entitled to suppression of his responses if the interrogation was "custodial." *See id.* at 823-24. Whether the interrogation was custodial depends on "whether a reasonable person in the [defendant's] shoes would have felt free to end the interview." *United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020). We look to the totality of the circumstances to determine whether a reasonable person would have felt free to end the interview, *id.*, including

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the

questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning,

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).[2]

Applying these factors here, we conclude that Johnson was not in custody during his interviews with Agents Cavanaugh and Vivier. True, the first factor weighs in Johnson's favor because the agents never informed him that he was free to leave or that he was not under arrest. And the fifth factor—whether the atmosphere of the questioning was police dominated—is mixed. On the one hand, the interviews were two-way discussions in which Johnson had an opportunity to ask questions, *see United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (concluding that the atmosphere was not police dominated in part because "[c]ommunication between the agents and [the defendant] consisted of two-way questioning"); on the other hand, the interviews occurred in the agents' vehicle, *cf.*

---

[2]Johnson argues that *Griffin*'s sixth factor is no longer good law because it is probative only of the officers' subjective intent, and the Supreme Court has held that whether an interrogation was custodial is an objective inquiry. *See, e.g.*, *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam) ("Our decisions make clear that [whether an interrogation was custodial] depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). Johnson overlooks the fact that whether the suspect was arrested at the end of the interrogation is probative of whether the suspect was genuinely free to leave during the interrogation, which in turn is probative of whether a reasonable person in the suspect's shoes would have felt free to leave. *See Griffin*, 922 F.2d at 1355 ("Griffin's arrest at the conclusion of the interview is objective evidence which tends to support the reasonableness of Griffin's subjective belief that he was in custody from the inception of the encounter and that his arrest was imminent."). Thus, the Supreme Court itself has recognized the relevance of whether the suspect was arrested at the end of the interrogation to the objective question whether the interrogation was custodial, *Howes v. Fields*, 565 U.S. 499, 509 (2012), and we have continued to apply *Griffin*'s sixth factor in the wake of the caselaw that Johnson cites, *e.g.*, *United States v. Sandell*, 27 F.4th 625, 630 (8th Cir. 2022). Accordingly, we apply *Griffin*'s sixth factor here.

*id.* (concluding that the atmosphere was not police dominated in part because it took place "in the comfort and familiarity of [the defendant's] home).

But the other factors weigh in the Government's favor. Johnson retained freedom of movement throughout the interviews: the agents did not handcuff him, the doors remained unlocked, and he entered and exited the front seat of the vehicle on his own. *See United States v. Soderman*, 983 F.3d 369, 377 (8th Cir. 2020) (concluding that the defendant "retained a degree of free movement" in a police car because he "was neither handcuffed nor forced to sit in the back seat"); *United States v. Hoeffener*, 950 F.3d 1037, 1046 (8th Cir. 2020) (holding that the defendant was not in custody in the front seat of a police car because he "was not handcuffed or otherwise restrained"). In addition, Johnson voluntarily acquiesced to both interviews. *See United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020) (concluding that there was no custodial interrogation in part because the defendant "entered . . . and answered [the officer's] questions voluntarily"); *Hoeffener*, 950 F.3d at 1046 (holding that the defendant was not in custody in part because, when "asked if he would sit in the front seat [of the police car] to talk," he "willingly and voluntarily did so"). Furthermore, the agents did not employ strong-arm or deceptive tactics but simply were candid with Johnson about the evidence against him. *Cf. Axsom*, 289 F.3d at 497, 502 (concluding that agents did not use strong-arm or deceptive tactics when they were candid about the crime that the defendant was suspected of committing and asked "straightforward questions"). Finally, Johnson was not arrested at the conclusion of either interview.

Johnson argues that he was nonetheless in custody because the agents stated that they "needed to talk with him." We disagree. When they said that they "needed to talk" with Johnson, the agents were merely offering a truthful explanation for their appearance at Johnson's home: their duties as criminal investigators required them to speak with Johnson. The agents never implied that the law or anything else required Johnson to speak with them. *See United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (en banc) (concluding that despite the "officers' use of the

colloquial phrase 'we need to talk to you,' . . . [t]here is absolutely no evidence that the officers told [the suspect] that he was obligated to speak with them").

In sum, considering the *Griffin* factors together in light of the totality of the circumstances, we conclude that Johnson was not in custody during his interviews with Agents Cavanaugh and Vivier. *See Hoeffener*, 950 F.3d at 1046 (reaching the same conclusion on similar facts). Therefore, the district court properly denied Johnson's suppression motion.

B.

We review the denial of a motion for a judgment of acquittal *de novo*. *United States v. Trotter*, 721 F.3d 501, 504 (8th Cir. 2013). A defendant is entitled to a judgment of acquittal due to insufficient evidence only if "no reasonable jury could have found [him] guilty beyond a reasonable doubt." *Id.* According to Johnson, this standard is met here because no reasonable jury could have found beyond a reasonable doubt that J.W.S.'s testimony was more credible than his own.

"A jury's credibility determinations are well-nigh unreviewable" on appeal, even when the standard of proof is beyond a reasonable doubt. *United States v. Njoroge*, 25 F.4th 555, 558 (8th Cir. 2022); *see also United States v. Seibel*, 712 F.3d 1229, 1237 (8th Cir. 2013) ("Even in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict."). As a result, "minor inconsistencies" in the testimony supporting a conviction "do not require acquittal." *United States v. Bradley*, 643 F.3d 1121, 1126 (8th Cir. 2011). On the contrary, "only . . . in extreme circumstances, such as when the witness testified to facts that are physically impossible," will we disturb the factfinder's decision to credit one witness's testimony over another's. *United States v. Jones*, 628 F.3d 1044, 1048 (8th Cir. 2011); *see also United States v. Hakim*, 491 F.3d 843, 845 (8th Cir. 2007); *United States v. Watson*, 952 F.2d 982, 988 (8th Cir. 1991).

No such extreme circumstances are present here. Indeed, Johnson labors in vain to find even minor inconsistencies in J.W.S.'s statements. For example, after citing J.W.S.'s testimony that, when she awoke, her jeans were pulled down to her ankles and Johnson was completing a sex act on her, Johnson questions "how [he could have] had sex with her while she was in a supine position with blue jeans around her knees." But J.W.S.'s testimony indicated that her jeans were around her ankles, not her knees, and there is nothing "physically impossible" about the claim that Johnson had sex with her while her jeans were around her ankles. *See Jones*, 628 F.3d at 1048. Similarly, Johnson strains to read J.W.S.'s statement to law enforcement on May 6, 2019 in a way that contradicts her trial testimony. In her May 6 statement, J.W.S. said, "[Johnson] was getting up off of me as I was waking and I heard his voice and he was dressed and I was laying there and I was waking." At trial, J.W.S. testified: "I woke up and my brother was getting off of me. He was getting dressed and he was leaving the room." Johnson insists that these statements are inconsistent because the former implies that Johnson was dressed when J.W.S. awoke and the latter implies that he was not. But the more natural interpretation of J.W.S.'s May 6 statement—given that J.W.S. made it in the context of explaining how Johnson was "rap[ing]" her when she awoke—is that Johnson got dressed while she was still in the process of waking up even though he had been undressed when she began to wake up.

Moreover, Johnson's argument would fail even if he had raised serious doubts about J.W.S.'s credibility. The jury was tasked not with assessing J.W.S.'s credibility in a vacuum but with assessing J.W.S.'s credibility relative to Johnson's. *Cf. United States v. Ireland*, 62 F.3d 227, 230 (8th Cir. 1995) (noting that the jury must have found the victim "more credible than" the defendant). And while he strains to find even minor inconsistencies in J.W.S.'s statements, Johnson ignores the major inconsistency in his own statements. After telling law enforcement twice that he did not have sex with J.W.S. at all, Johnson testified at trial that he did have sex with J.W.S. but that it was consensual. In these circumstances, a reasonable jury could have credited J.W.S.'s testimony over Johnson's even assuming there were grounds to question J.W.S.'s credibility. *See United States v. Kirkie*, 261 F.3d 761,

765, 767-68 (8th Cir. 2001) (upholding the jury's decision to credit the sexual-abuse victim's testimony over the defendant's testimony notwithstanding "discrepancies in the victim's reporting in light of her own previous statements and the testimony of other witnesses"). The district court properly denied Johnson's motion for a judgment of acquittal.

## III.

For the foregoing reasons, we affirm Johnson's conviction.

_____